[No. D052533. Fourth Dist., Div. One. Mar. 20, 2009.]

ROBERT REESE BAINS III et al., Plaintiffs and Appellants, v. JOHN J. MOORES et al., Defendants and Respondents.

446

## COUNSEL

Patricia A. Meyer & Associates, Patricia A. Meyer, Trevor M. Flynn; Robert P. Ottilie; Kiesel Boucher & Larson and Raymond P. Boucher for Plaintiffs and Appellants.

Quinn Emanuel Urquhart Oliver & Hedges, John B. Quinn, Harry A. Olivar, Jr.; Kirby Noonan Lance & Hoge, David J. Noonan; Niddrie Fish & Buchanan and David A. Niddrie for Defendant and Respondent John J. Moores.

David A. Hahn; Gibbs & Bruns, Robin C. Gibbs, J. Christopher Reynolds, Ayesha Najam, Jeffry J. Cotner and Aundrea K. Frieden for Defendant and Respondent Charles E. Noell III.

Bewley, Lassleben & Miller, Leighton M. Anderson and David A. Brady for Defendant and Respondent Christopher A. Cole.

**OPINION**

**AARON, J.—**

## I.

## INTRODUCTION

In February 2003, Robert Reese Bains III and a group of former Peregrine Systems, Inc. (Peregrine), shareholders (collectively plaintiffs) filed this action against former Peregrine directors John J. Moores, Charles E. Noell III, and Christopher A. Cole (collectively defendants), as well as several former Peregrine employees, Peregrine's former outside accounting firm, and two of Peregrine's former business partners.[1] In their complaint, plaintiffs alleged that they had been induced to hold Peregrine stock from May 1997 through 2002 by Peregrine's false, fraudulent and misleading financial reports.[2] Plaintiffs alleged that Peregrine engaged in various fraudulent accounting practices that led to the improper recognition of revenue in Peregrine's financial statements, for the purpose of increasing Peregrine's stock price. Plaintiffs further alleged that in May 2002, after the initial public disclosure of the improper practices, Peregrine's stock price fell dramatically, causing plaintiffs to suffer damages. Plaintiffs averred that in February 2003, Peregrine issued restated financial statements for fiscal years 2000 and 2001, and for the first three quarters of 2002, and that the financial statements reduced by $509 million previously reported revenue in the amount of $1.34 billion. Of the $509 million, $259 million was deducted for nonsubstantiated transactions. Plaintiffs' complaint contained various fraud and fraud-related causes of action.

Defendants filed motions for summary judgment in which they contended that plaintiffs could not prevail on any of their fraud or fraud-related causes of action because there was no evidence from which a reasonable trier of fact could conclude that defendants participated in, or knew about, any of the fraudulent accounting practices.[3] Plaintiffs filed a motion to stay the proceedings on the ground that they needed to obtain additional discovery from witnesses who had previously invoked their Fifth Amendment rights and refused to provide substantive testimony in this case. The trial court denied plaintiffs' motion for a stay, and granted defendants' motions for summary judgment.

---

[1] Only plaintiffs, Moores, Noell, and Cole are parties to this appeal.

[2] We base our introduction on the only complaint that is in the record—plaintiffs' fourth amended complaint.

[3] Cole filed a motion for summary judgment. Thereafter, Noell and Moores filed a joint motion for summary judgment.

On appeal, plaintiffs claim that the trial court erred in granting judgment for defendants as a matter of law on the fraud and fraud-related causes of action. Specifically, plaintiffs claim that the trial court erred in concluding that plaintiffs failed to identify evidence from which a jury could find that defendants knew that Peregrine's financial reports contained false information. Plaintiffs also contend that there are triable issues of material fact with respect to whether defendants are liable on these causes of action pursuant to the "group published information" doctrine.[4] Plaintiffs further claim that the trial court erred in sustaining Noell's and Moores's demurrers[5] to plaintiffs' claim that they were liable for various California statutory securities law violations pursuant to Corporations Code section 25504.[6] Finally, plaintiffs contend that the trial court erred in denying their motion to stay the proceedings. We reject all of plaintiffs' claims and affirm the judgment.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

In February 2003, plaintiffs filed their original complaint in this action. In November 2004, the trial court sustained Noell's and Moores's demurrers to plaintiffs' section 25504 claim.

In December 2005, plaintiffs filed a fourth amended complaint premised on the allegations of financial accounting fraud summarized in part I., *ante.* Among other causes of action, plaintiffs' claims included market manipulation (§§ 25400, subd. (d), 25500) (First Cause of Action), control person liability (§ 25504) (Fourth Cause of Action),[7] fraud and deceit by active concealment (Fifth Cause of Action), fraud and deceit based on omissions

---

[4] As we explain in detail in part III.B., *post,* the group published information doctrine is a pleading doctrine that, where applicable, allows a party to attribute statements made in a company's public documents, such as annual reports and press releases, to individual members of the company's board of directors. (See *Kamen v. Lindly* (2001) 94 Cal.App.4th 197, 208 & fn. 8 [114 Cal.Rptr.2d 127] (*Kamen*).)

[5] Although the demurrers are not in the record on appeal, the trial court's November 2004 order sustaining the demurrers is in the record.

[6] Unless otherwise specified, all subsequent statutory references are to the Corporations Code. Section 25504 provides for a form of vicarious liability for violations of certain California statutory securities law provisions for those who "directly or indirectly control[] a person" liable for such violations.

[7] Plaintiffs did not allege this cause of action against Moores and Noell in light of the trial court's November 2004 order sustaining their demurrers to this claim. As discussed in detail in part III.C., *post, the court subsequently dismissed plaintiffs' section 25504 claim against Cole without prejudice,* pursuant to a stipulation between plaintiffs and Cole whereby plaintiffs preserved their right to reinstate their claim against Cole in the event that this court reverses the trial court's November 2004 order.

and misrepresentations (Sixth Cause of Action), negligent misrepresentations (Seventh Cause of Action), aiding and abetting fraud and deceit (Ninth Cause of Action), aiding and abetting breach of fiduciary duty (Tenth Cause of Action), and common law conspiracy (Twelfth Cause of Action).

In March 2006, Cole filed a motion for summary judgment. In his motion, Cole argued that the court should grant summary adjudication as to plaintiffs' fraud and fraud-related causes of action because he had not been a participant in the use of improper revenue-recognition practices at Peregrine, and was not aware of such practices until the board of directors conducted an internal investigation that led to the discovery of the practices in April through May 2002. Cole further argued that any statements he made, on which plaintiffs may have relied, were based on credible assurances Cole had received from Peregrine management and auditors that the matters stated were true. Finally, Cole maintained that he could not be held liable pursuant to the group published information doctrine.

In June 2007, Noell and Moores filed a joint motion for summary judgment. Noell and Moores argued that plaintiffs' fraud and fraud-related causes of action failed because plaintiffs could not demonstrate either that Noell or Moores knew of the financial statement fraud at Peregrine, or that they had reason to believe that Peregrine's financial statements contained false information.

In August 2007, plaintiffs filed a combined opposition to defendants' motions for summary judgment. Plaintiffs also filed a motion to stay the proceedings and a request to continue the summary judgment hearing on the ground that they had been unable to obtain necessary discovery due to related pending or threatened criminal proceedings. In September 2007, after hearing oral argument, the trial court denied plaintiffs' motion to stay the proceedings and their request to continue the summary judgment proceedings.

In December 2007, after hearing oral argument, the trial court entered an order granting defendants' motions for summary judgment. In its order, the court reviewed the material allegations in the fourth amended complaint, and noted that plaintiffs alleged that "defendants engaged in a fraudulent financial scheme . . . to inflate Peregrine's stock price." The court continued, summarizing plaintiffs' claims as follows: "Plaintiffs contend that the heart of the fraud was the recording of hundreds of millions of dollars of revenue despite non-binding arrangements with customers, in violation of Generally Accepted Accounting Principles ('GAAP') and Peregrine's revenue recognition policy.

Moores . . . Noell . . . and Cole directed deceptive practices to artificially inflate Peregrine's revenue resulting in increased stock value in order to sell their own stock at overstated prices. (FAC [Fourth Amended Complaint] ¶ 15). Beginning in 1999, defendants[8] engaged in improper revenue recognition, especially in connection with software sales to resellers known as 'channel partners' and directed the employees and agents to engage in deceptive sales and accounting practices to create the illusion of growth, including secretly adding material sale contingencies and side agreements to what on their face appeared to be binding contacts. (FAC ¶¶ 16, 18.)"

In reviewing the evidence presented on these issues, the trial court concluded, "[Moores, Noell, and Cole] have met their burden of proof to show they had no actual knowledge of the financial fraud committed by the employees and officers of Peregrine. Plaintiffs have failed to raise a material fact that defendants, as outside directors, should be held liable for fraud." (Original formatting omitted.) Specifically, the trial court observed that plaintiffs' fraud and fraud-related causes of action required proof that defendants had made statements that they knew to be false, or that defendants had made statements with reckless disregard for their truth or falsity. The court observed that defendants had presented direct evidence that they did not know about the fraud committed by Peregrine employees at the time they signed various financial statements. Defendants also presented evidence that they had relied on the recommendations of Peregrine's in-house counsel, outside counsel, and outside accounting firm, in signing these statements. With respect to plaintiffs' evidence, the court concluded, "Plaintiffs have not raised a triable issue of fact that defendants intended to defraud or that they, as outside directors, had knowledge of the fraud [sufficient] to raise a duty to disclose the true facts to plaintiffs."[9]

The trial court subsequently entered judgment in favor of defendants. Plaintiffs timely appeal from the judgment.[10]

---

[8] The trial court's use of the term "defendants" included the Peregrine employees who are not parties to this appeal.

[9] We discuss in part III.A.3., *post*, each of the types of evidence that plaintiffs contend, in their opening brief on appeal, supports reversal of the trial court's grant of summary judgment.

[10] While this appeal was pending, defendants filed a motion to strike plaintiffs' reply appendix on the ground that the documents contained therein were not in the summary judgment record that was before the trial court. Defendants also requested that this court strike from plaintiffs' reply brief any references to these documents. Plaintiffs filed an opposition to the motion to strike and requested that this court take judicial notice of the documents. Defendants opposed this request. In their opposition to the motion to strike, plaintiffs claimed that the documents address "new issues and defenses raised by [defendants] in their [briefs on appeal]." The documents pertain to a federal proceeding that arose out of the accounting irregularities at Peregrine, a United States Securities and Exchange Commission (SEC) filing concerning

## III.

## DISCUSSION

A. *The trial court did not err in concluding that plaintiffs failed to identify evidence from which a jury could find that defendants knew about the fraud at Peregrine*

Plaintiffs claim that the trial court erred in concluding that there was no evidence from which a reasonable fact finder could find that defendants knew about the fraud committed at Peregrine. We disagree.

### 1. *The scope of plaintiffs' claim on appeal*

Plaintiffs' claim pertaining to defendants' knowledge of ongoing fraud at Peregrine is captioned, "THE TRIAL COURT ERRED AS A MATTER OF LAW IN DETERMINING WHAT CONSTITUTES EVIDENCE OF KNOWLEDGE." Plaintiffs' opening brief makes clear that this claim is intended to encompass, at a minimum, the fraud causes of action that plaintiffs allege in their fourth amended complaint, namely fraud and deceit by active concealment (Fifth Cause of Action) and fraud and deceit based on omissions and misrepresentations (Sixth Cause of Action). However, plaintiffs' opening brief is not clear as to whether this claim is also directed at their causes of action for market manipulation (§ 25400, subd. (d) (First Cause of Action), aiding and abetting fraud and deceit (Ninth Cause of Action), aiding and abetting breach of fiduciary duty (Tenth Cause of Action), and common law conspiracy (Twelfth Cause of Action).

Cole contends that plaintiffs have forfeited all appellate contentions with respect to the First, Ninth, Tenth, and Twelfth Causes of Action by failing to address these claims in their opening brief. Noell and Moores similarly contend that plaintiffs have forfeited any claims pertaining to the Ninth, Tenth, and Twelfth Cause of Action. Plaintiffs maintain in their reply brief that a "ruling by this Court that Plaintiffs put forth sufficient evidence to

one of the companies that Peregrine acquired for the alleged purpose of hiding the improper accounting practices, some draft minutes from a meeting of the Peregrine board of directors, and an excerpt from Moores's deposition.

We conclude that neither the documents in plaintiffs' reply appendix nor the issues to which they purportedly respond are material to our disposition of this case. Accordingly, we deny plaintiffs' request for judicial notice and deny as moot defendants' motion to strike.

raise an issue of fact on scienter,[11] would cause reversal of the First, Fifth, Sixth, Seventh,[12] Ninth, Tenth, and Twelfth causes of action."

We conclude below (see pt. III.A.3., *post*) that plaintiffs have failed to identify evidence that raises a genuine issue of fact regarding defendants' knowledge of the fraud at Peregrine. Plaintiffs thus are not entitled to reversal of the trial court's grant of judgment as a matter of law on any fraud or fraud-related cause of action. Accordingly, we need not consider whether plaintiffs have forfeited their appellate claims as to the First, Ninth, Tenth, and Twelfth Causes of Action.

In a separate claim in their opening brief, plaintiffs contend that the trial court erred in granting judgment as a matter of law in favor of defendants on plaintiffs' negligent misrepresentation claim (Seventh Cause of Action). Plaintiffs note, " 'The elements of negligent misrepresentation are similar to intentional fraud except for the requirement of scienter; in a claim for negligent misrepresentation, the plaintiff need not allege that the defendant made an intentionally false statement, but simply one as to which he or she lacked any reasonable ground for believing the statement to be true.' [Citations.]" (Quoting *Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 184–185 [51 Cal.Rptr.3d 471].)

Plaintiffs provide no analysis in their brief as to how the evidence in the record demonstrates the existence of a triable issue of fact on the question whether defendants made false statements without having any reasonable ground for believing the statements to be true. In light of our rejection of plaintiffs' contention with regard to the scienter element of their fraud and other fraud-related causes of action (see pt. III.A.3., *post*), and plaintiffs' failure to provide any distinct analysis regarding the intent element of their negligent misrepresentation claim, we reject plaintiffs' claim that the trial court erred in granting summary judgment in favor of defendants on this claim.

### 2. *Standard of review*

A moving party is entitled to summary judgment when the party establishes that it is entitled to the entry of judgment as a matter of law. (Code Civ.

---

[11] In describing the elements of common law fraud, California courts have used the term "scienter" to refer to a defendant's knowledge of the falsity of a statement. (See *Unterberger v. Red Bull North America, Inc.* (2008) 162 Cal.App.4th 414, 423 [75 Cal.Rptr.3d 368] (*Unterberger*).)

[12] As we explain below, plaintiffs clearly, albeit inadequately, raise a separate appellate claim regarding their cause of action for negligent misrepresentation (Seventh Cause of Action).

Proc., § 437c, subd. (c).) A defendant may make this showing by establishing that the plaintiff cannot establish one or more elements of all of his causes of action, or that the defendant has a complete defense to each cause of action. (*Towns v. Davidson* (2007) 147 Cal.App.4th 461, 466 [54 Cal.Rptr.3d 568].)

In reviewing a trial court's ruling on a motion for summary judgment, the reviewing court makes " 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law. [Citations.]' " (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1143 [29 Cal.Rptr.3d 144], quoting *Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222–223 [38 Cal.Rptr.2d 35].)

"On review of a summary judgment, the appellant has the burden of showing error, even if he did not bear the burden in the trial court. [Citation.] . . . '[D]e novo review does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues. As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority. In other words, review is limited to issues which have been adequately raised and briefed.' [Citation.]" (*Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 230 [35 Cal.Rptr.3d 837].)

> 3. *None of the evidence to which plaintiffs refer in the argument portion of their opening brief on appeal raises a genuine issue of material fact as to defendants' knowledge of the fraud at Peregrine*

■ "To avoid summary adjudication of [their] fraud claim, [plaintiffs were] required to produce evidence of (1) a misrepresentation, (2) *knowledge of falsity (or 'scienter')*, (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance, and (5) resulting damage. [Citation.]" (*Unterberger, supra,* 162 Cal.App.4th at p. 423, italics added.)

In the argument portion of their opening brief, plaintiffs identify four categories of evidence that they contend demonstrate a triable issue of fact with respect to defendants' knowledge of the fraud at Peregrine: (1) defendants' sales of Peregrine stock; (2) inconsistencies between information presented to Peregrine's board and Peregrine's public disclosures; (3) evidence

of purported red flags identified by plaintiffs' expert; and (4) Moores's receipt of an e-mail from a Peregrine employee concerning "channel stuffing."[13]

We address each category of evidence, and plaintiffs' arguments pertaining to such evidence, below.[14]

### a. Defendants' sales of Peregrine stock

Plaintiffs contend that defendants' sales of Peregrine stock raise a genuine issue of material fact as to defendants' knowledge of the fraud at Peregrine.

### (i) Case law

In *Zucco Partners, LLC v. Digimarc Corp.* (9th Cir. 2009) 552 F.3d 981, 1005 (*Zucco Partners*), the United States Court of Appeals for the Ninth Circuit described how stock sales by a corporate insider may constitute evidence of the insider's scienter for purposes of establishing a violation of federal securities law: "As we have previously articulated, '[a]lthough "unusual" or "suspicious" stock sales by corporate insiders may constitute circumstantial evidence of scienter, insider trading is suspicious only when it is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." ' [Citation.] Among three factors that must be considered to determine whether stock sales raise a strong inference of deliberate recklessness are: '(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.' [Citation.]"

In concluding that the district court had not erred in dismissing the plaintiffs' complaint for failing to plead facts sufficient to support an inference of scienter, the *Zucco Partners* court stated: "As the district court correctly noted, the [complaint] 'fail[s] to provide any information on the trading history of [two of the company's officers] for purposes of comparison to the stock sales at issue.' [Citation.] For individual defendants' stock sales

---

[13] The term "channel stuffing" refers generally to the practice of " ' "oversupply[ing] . . . distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders, while they deplete their excess supply." ' " (*In re Connetics Corp. Securities Litigation* (N.D.Cal. 2008) 542 F.Supp.2d 996, 1011.)

[14] Plaintiffs' brief on appeal focuses exclusively on the knowledge of falsity element of their fraud and fraud-related causes of action, on the ground that a failure of proof as to this element was the sole basis for the trial court's summary judgment order with respect to plaintiffs' First, Fifth, Sixth, Seventh, Ninth, Tenth, and Twelfth Causes of Action.

to raise an inference of scienter, plaintiffs must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period. [Citation.] Even if the defendant's trading history is simply not available, for reasons beyond a plaintiff's control, the plaintiff is not excused from pleading the relevant history. *See* [*In re Vantive Corp. Securities Litigation* (9th Cir. 2002) 283 F.3d 1079, 1095] (noting that '[b]ecause [the defendant] joined Vantive four months into the class period, he has no relevant trading history,' and thus finding that '[b]ecause [the defendant] had no trading history, we cannot conclude that his trades were out of line with his past practice'); [*Ronconi v. Larkin* (9th Cir. 2001) 253 F.3d 423, 435–436; *In re Silicon Graphics Inc. Securities Litigation* (9th Cir. 1999) 183 F.3d 970, 987–988] (rejecting an inference of scienter when a defendant sold over 75.3 percent of his stock holdings during the class period, because the defendant was 'legally forbidden to trade' for a long period before the class period and thus had no meaningful trading history). . . . Thus, since there is no allegation within the [complaint] that [the officers'] stock sales, though significant, are inconsistent with their usual trading patterns, no inference of scienter can be gleaned from Zucco's stock sale assertions." (*Zucco Partners, supra*, 552 F.3d at pp. 1005–1006; see also *In re Daou Systems, Inc.* (9th Cir. 2005) 411 F.3d 1006, 1022–1023 ["At a minimum . . . 'the trading must be in a context where defendants have incentives to withhold material, non-public information, and it must be unusual, well beyond the normal patterns of trading by those defendants.' "].)

While the *Zucco* court concluded that one could not reasonably infer scienter from the defendants' stock sales in that case, plaintiffs in this case note that in *Kaplan v. Rose* (9th Cir. 1994) 49 F.3d 1363, 1379–1380 (*Kaplan*), the Ninth Circuit concluded that the defendants' stock sales *were* sufficient to create a genuine issue of material fact as to their scienter on the plaintiffs' securities fraud claims. The defendants in *Kaplan*—the president and the CEO of a company—sold a large percentage of their stock in the company (one-fourth and two-thirds of their holdings, respectively), as soon as legally possible after the company's public offering in June 1988. (*Id.* at p. 1379.) In August 1989, just before the release of important clinical test results pertaining to the company's medical device product, the president sold the remainder of his stock. (*Id.* at pp. 1368, 1379.) The Ninth Circuit concluded that evidence of these sales was sufficient to raise a genuine issue of material fact regarding the defendants' scienter, noting that the sales "were not consistent with earlier [trading] patterns," and that the sales were "in large amounts and at sensitive times." (*Id.* at pp. 1379–1380.)

Plaintiffs also cite *Provenz v. Miller* (9th Cir. 1996) 102 F.3d 1478 (*Provenz*), in which the Ninth Circuit held that the district court had erred in concluding that two corporate officers' sale of the corporation's stock did not support a finding of scienter. The *Provenz* court summarized the evidence on

this issue as follows: "The district court incorrectly concluded that the sales of stock by Miller and Boesenberg did not support a finding of scienter. There is evidence that Miller, [the corporation's] chairman and CEO, and Boesenberg, [the corporation's] president, traded their stock in large amounts at sensitive times. Miller sold about 20% of his stock for $1,340,000. Boesenberg sold about 90,000 shares during the class period—almost six times more stock than he had sold during the twelve months preceding the class period—for $1,479,650. Both Miller and Boesenberg sold their stock shortly after the April 25, 1991 conference call but before the $4 million loss and the restructuring charge were disclosed to the public." (*Id.* at p. 1491.)

(ii) *Application*

(a) *For purposes of this decision, we assume that suspicious stock sales may raise an inference of scienter under California law*

Plaintiffs have not cited, and we are not aware of, any California authority in which a court has concluded that suspicious stock sales by members of a corporation's board of directors may constitute circumstantial evidence of the directors' scienter for purposes of establishing a fraud or fraud-related cause of action under California law. Nevertheless, we will assume that for purposes of proving fraud under California law, " '[u]nusual trading or trading at suspicious times or in suspicious amounts by corporate insiders . . . [is] probative of scienter' " (*In re Daou Systems, Inc., supra,* 411 F.3d at p. 1022), and we will apply the factors that the federal courts have used to determine whether a defendant's stock sales may be considered suspicious for purposes of violations of federal securities law, as described in the federal authorities cited in part III.A.3.a.(i), *ante.*[15]

(b) *Plaintiffs contend in their opening brief that defendants' February 2000 stock sales were suspicious*

A plaintiff who seeks to prove scienter through evidence of suspicious insider trading must specifically identify those stock sales that the plaintiff contends are suspicious. In their opening brief, plaintiffs appear to contend

[15] Plaintiffs do not contend that California law should differ from federal law on this issue. In their opening brief, plaintiffs acknowledge that "[t]he relevant factors to consider in determining if the trades are suspicious are: 1) the amount and percentage of shares sold by insiders; 2) the timing of sales; and 3) whether the sales were consistent with the insider's prior trading history."

that defendants' sales of Peregrine stock in February 2000 were suspicious. For example, plaintiffs state, "Within days of meeting with the CEO and the auditor who instructed that Peregrine change its ways of recognizing revenue [in January 2000], Moores, Noell, and Cole sold an unprecedented amount of stock, in excess of $200 million. [Citation.] These facts show suspicious insider trading sufficient to create an inference of scienter." Plaintiffs similarly contend, "[D]efendants sold off large sums of stock nine months into continuous bad reports," and maintain that defendants received the first such report in April 1999.[16] Plaintiffs' contention in their opening brief, that "The discovery referee also found the inside[r] trades occurring in *February 2000* were suspicious," lends further support to our conclusion that plaintiffs' argument is directed at defendants' February 2000 stock sales.[17] (Italics added.) We therefore consider the evidence that plaintiffs cite in their brief in support of their contention that defendants' February 2000 stock sales were suspicious.[18]

> (c) *Plaintiffs have failed to demonstrate that defendants' stock sales in February 2000 were sufficiently suspicious to raise a genuine issue of material fact as to defendants' scienter*

Plaintiffs include three bar graphs in their opening brief, one pertaining to each defendant, and contend that these graphs demonstrate that defendants' sales of Peregrine stock were suspicious. With respect to Moores, the y-axis of the graph is labeled "No. of Shares Sold" and contains numbers ranging

---

[16] Plaintiffs further contend that "in four consecutive board meetings starting in April 1999, Moores, Noell, and Cole were told in writing by management and by Peregrine's auditors that Peregrine was engaged in channel stuffing activities," and that "[i]n the nine months *leading up* to this *massive stock sell-off*, Moores, Noell, and Cole were repeatedly told of Peregrine's serious financial troubles and difficulties generating revenue." (Italics added.)

[17] It appears that the discovery referee in fact made no such finding. In the discovery order to which plaintiffs refer in their brief, the referee considered various federal cases in determining whether evidence of Cole's use of the proceeds of his sale of Peregrine's stock was relevant to plaintiffs' claims. On the page of the record that plaintiffs cite in their brief, the discovery referee states, "Based upon the cases discussed in the previous section, it would seem that suspicious insider trading is circumstantial evidence of knowledge. . . ." We do not read this statement as constituting a finding that Cole's stock sales were in fact suspicious. Further, even assuming that the discovery referee had made such a finding, it would have no relevance to this appeal, in light of the applicable de novo standard of review. (See pt. III.A.2., *ante.*)

[18] In their reply brief, plaintiffs appear to contend that *all* of defendants' stock sales in the period February 1999 through February 2000 were suspicious. We need not consider this argument, since plaintiffs raise it for the first time in reply without having made any showing of good cause for failing to raise the argument in their opening brief. (See *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894, fn. 10 [93 Cal.Rptr.2d 364] [" ' "points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before . . ." ' "].)

from 500,000 through 7 million, in increments of 500,000. The x-axis shows the time period August 1997 through February 2001. Bars representing the number of shares sold each month during this time period appear on the graph. Between the bars are the following statements: "April 1999—Peregrine CFO tells Defendants the Company will MISS market expectations," "July 1999—Board votes to sell Receivables," "October 1999—CEO tells the Board there are problems with revenue," "January 2000—CEO and Auditors tell the Board that there are concerns and recommend a change in revenue recognition."[19] Plaintiffs constructed this graph using data obtained from forms entitled "Statement of Changes in Beneficial Ownership" that Moores filed with the SEC.[20]

The graph pertaining to Moores shows that he sold approximately 200,000 shares in October 1997.[21] In 1998, in five different months, Moores sold a total of approximately 2.5 million shares. In 1999, Moores sold approximately 1.25 million shares in February, 2.5 million shares in May, and 2,225,000 shares in July. Moores sold approximately 6.5 million shares in February 2000, and approximately 3.5 million shares in February 2001.[22]

Applying the factors described in *Zucco Partners* to this data, we observe the following: The graph pertaining to Moores's sales of stock indicates that Moores sold approximately 18,675,000 shares from October 1997 through February 2001. Approximately 35 percent of these sales were made in

---

[19] These statements appear on each of the three bar graphs. The statements summarize nonpublic information that plaintiffs contend led defendants to sell stock in February 2000. We need not describe in detail the evidence on which plaintiffs base these summaries, in light of our conclusion that plaintiffs have failed to identify evidence from which this court can conclude that defendants' February 2000 stock sales were sufficiently suspicious to give rise to a triable issue of fact as to defendants' scienter. However, we do discuss in the text of this opinion the evidence on which plaintiffs rely to support their assertions regarding information that defendants gained in January 2000, in light of the temporal proximity to the February 2000 sales.

[20] Plaintiffs fail to cite to any SEC forms in the record evidencing Moores's sales of Peregrine stocks in the year 1998. However, the graph in plaintiffs' brief suggests that Moores sold at least 2.5 million shares of Peregrine stock in 1998. We assume for purposes of this opinion that plaintiffs' graph is correct.

[21] We emphasize that these are approximations gleaned from the graphs presented in plaintiffs' briefs on appeal.

[22] In their brief, plaintiffs also cite to exhibit No. 3080, entitled "Moores Group—Sale of Peregrine Stock." This exhibit summarizes in tabular form on a yearly basis (1) the total number of Peregrine shares sold by Moores and his wife, as well as various affiliated entities or trusts, from 1999 through 2002; (2) the total amount of proceeds from those sales; (3) the cost of the shares; and (4) the gain or loss from the sales. Plaintiffs make no argument with respect to the evidence presented in this exhibit in their opening brief.

February 2000, the allegedly suspicious period. Accordingly, while plaintiffs provide no information in the graph that would allow us to determine the percentage of Moores's total holdings that these sales represented,[23] the percentage necessarily must have been lower than 35 percent. This percentage is lower than the percentage that the Ninth Circuit has held is ordinarily sufficient to support an inference of scienter. (See *Metzler Inv. GMBH v. Corinthian Colleges, Inc.* (9th Cir. 2008) 540 F.3d 1049, 1067 ["[Defendant] sold only 37% of his total stock holdings during the Class Period. We typically require larger sales amounts . . . to allow insider trading to support scienter."].)

With regard to the timing of Moores's stock sales, plaintiffs alleged in the operative complaint that the fraudulent misrepresentations began in July 1999 and continued until March 2002. Unlike the stock sales in the cases on which plaintiffs principally rely, *Kaplan, supra,* 49 F.3d at page 1380 and *Provenz, supra,* 102 F.3d at page 1491, in which the defendants sold shares at "sensitive times" (*Kaplan, supra,* 49 F.3d at p. 1380) after having acquired discrete pieces of nonpublic information that were likely to be material to their company's share price (*Provenz, supra,* 102 F.3d at pp. 1488, 1491 [sales of shares after conference call on Apr. 25 and before July 30 public announcement of restructuring charge supported finding of scienter]), plaintiffs in this case have demonstrated, at most, that Moores and the other defendants were provided with some negative information about Peregrine's economic prospects over a period of nine months (i.e., in Apr., July, and Oct. 1999, and in Jan. 2000), prior to the allegedly suspicious sales.[24]

Plaintiffs note that in January 2000, Peregrine's CEO told the board of directors the following: "Our channel business is now a cause for concern. . . . We have not been as successful, and in some cases unsuccessful, in getting the sell-through that would remove the inventory of software from the channels. Rather than a 3 to 6 month latency, the inventory is moving in closer to 9 months . . . . The net of this is that we are now at a level of channel inventory that makes our auditors uncomfortable. Therefore, we are going to change the way we compensate the channel sales force to place emphasis on sell-through and up-front payment. We . . . will start to treat portions of contracts as unbooked for purposes of revenue recognition until either payment or sell-through has occurred. This will take us two to three quarters to work through."

---

[23] By "total holdings" we mean the total number of shares that a defendant held over the entire time period represented in plaintiffs' graphs.

[24] Plaintiffs raise no argument in their opening brief concerning the particular dates on which defendants sold stock. Plaintiffs summarize defendants' sales on a monthly basis.

Plaintiffs also note that in January 2000, Peregrine's outside auditor, Richard Bigelow,[25] expressed concerns to the board's audit committee regarding the company's accounting practices pertaining to channel sales.[26] In his deposition, Bigelow testified:

"Q: Okay. Going back to my question . . . did your report to the audit committee—would it have told them or intimated to them in some way that the channel inventory situation had led you to believe that the financial statements were misstated?

"[Bigelow]: My [communication] to the audit committee was that we had a buildup in channel inventory that caused me enough concern that, one, I thought the company need[ed] to reassess its accounting for channel sales; and, two, that when you have a buildup like that, there was a risk that the company would start granting some sort of concessions, which would violate the provisions of [American Institute of Certified Public Accountants Statement of Position 97-2, 'Software Revenue Recognition'] 97-2 and bring the whole question of previous revenue recognition to the forefront."

The fact that an auditor and Peregrine's CEO expressed concerns to defendants about the appropriateness of continuing to use the existing accounting method to account for channel sales does not constitute evidence that defendants knew about the fraud at Peregrine, nor is it the type of highly sensitive nonpublic information that would be likely to have a material effect on a company's share price, as discussed in the case law that plaintiffs cite.[27] We therefore conclude that the timing of Moores's stock sales in February 2000 does not support the conclusion that the sales were suspicious.[28]

Although February 2000 represents the single largest volume month of shares sold by Moores, we cannot conclude that the quantity of shares that Moores sold in that month was " ' "dramatically out of line with prior trading

---

[25] Although not indicated on the page of the record that plaintiffs cite, we assume for purposes of this opinion that plaintiffs presented evidence demonstrating that Bigelow made these statements to the audit committee in January 2000, as plaintiffs contend in their brief.

[26] Cole contends that the evidence is irrelevant as to him because he "was not a member of the Audit Committee and never heard Bigelow's remarks." In light of our conclusion that one cannot reasonably infer knowledge of fraud at Peregrine from either Bigelow's January 2000 statements and/or from defendants' sales of stock in February 2000, we need not consider Cole's contention.

[27] Immediately after making this comment during his deposition, Bigelow acknowledged that his accounting firm continued to issue a "clean opinion" on Peregrine's financial statements notwithstanding these concerns.

[28] The fact that the fraud at Peregrine continued for approximately two years after February 2000 further weakens any potential inference that one might draw from the timing of the February 2000 stock sales.

practices." ' " (*Zucco Partners, supra*, 552 F.3d at p. 1005; compare with *Provenz, supra*, 102 F.3d at p. 1491 [defendant sold "six times more stock [in the class period] than he had sold during the twelve months preceding the class period"].) Further, since plaintiffs did not provide any argument in their brief concerning the price of the shares over time, they have not demonstrated that the sales were " ' "calculated to maximize the personal benefit from undisclosed inside information." ' "[29] (*Zucco Partners, supra*, 552 F.3d at p. 1005.)

With respect to Noell, plaintiffs include a bar graph entitled, "Noell's Suspicious Trades." The y-axis of the graph is labeled "No. of Shares Sold" and contains numbers ranging from zero through 100,000 in increments of 10,000. The x-axis shows various months between February 1998 and December 2002. Bars representing the number of sales per month during this time period appear on the graph. Plaintiffs constructed this graph using data obtained from forms entitled "Statement of Changes in Beneficial Ownership," that Noell filed with the SEC.[30]

The graph shows that Noell sold approximately 30,000 shares in October 1998, approximately 50,000 shares in February 1999, and approximately 25,000 shares in May 1999. In February 2000, Noell sold approximately 90,000 shares and in February 2001 he sold another 80,000 shares. In December 2002, Noell sold approximately 40,000 shares. Noell sold a total of approximately 315,000 shares in the time period from October 1998 through December 2002. Approximately 29 percent of the sales occurred in February 2000. Noell thus sold a smaller percentage of his total holdings (as defined in fn. 23, *ante*) in the allegedly suspicious period than the Ninth Circuit has held may ordinarily support an inference of scienter. (See *Metzler Inv. GMBH v. Corinthian Colleges, Inc., supra*, 540 F.3d at p. 1067.)

The fact that Noell sold approximately 40,000 shares in December 2002, *after* the fraud was publicly disclosed, further weakens any inference of scienter on his part. (See *In re Worlds of Wonder Securities Litigation* (9th Cir. 1994) 35 F.3d 1407, 1428 [sales of stock "*after* the announcement of large quarterly losses" do not support inference of scienter].) The analysis provided above with respect to the lack of probative value of the timing of

---

[29] The record on appeal contains evidence related to this issue, but plaintiffs made no argument regarding the relevance of this evidence in their opening brief. "It is not [this court's] place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [57 Cal.Rptr.3d 363].)

[30] As with Moores, plaintiffs fail to cite to any SEC forms in the record evidencing Noell's sales of Peregrine stocks in the year 1998. However, the graph in plaintiffs' brief, which we assume to be accurate, suggests that Noell sold approximately 30,000 shares of Peregrine stock in February 1998.

Moores's sales applies equally to Noell. In addition, it is not clear that Noell's trades in February 2000 were unusual, since he sold a total of approximately 75,000 shares in 1999, 90,000 shares in 2000, and 80,000 shares in 2001. (Compare with *No. 84 Employer-Teamster v. America West Holding* (9th Cir. 2003) 320 F.3d 920, 939–940 ["massive insider trading over . . . three month period of time, after an extended period of inactivity, appears unusual"].) Finally, as noted above with respect to Moores, because plaintiffs include no information in their opening brief as to the price of the shares over time, they have not demonstrated that Noell's February 2000 sales were " ' "calculated to maximize the personal benefit from undisclosed inside information." ' " (*Zucco Partners, supra*, 552 F.3d at p. 1005.)

With respect to Cole, plaintiffs include a bar graph entitled, "Cole's Suspicious Trades." The y-axis of the graph is labeled "No. of Shares Sold" and contains numbers ranging from zero through 600,000 in increments of 100,000. The x-axis includes various months between February 1999 and February 2002. Bars representing the number of sales sold each month during this time period appear on the graph. Plaintiffs constructed this graph using information that Cole provided in a declaration.[31]

The graph shows that Cole sold approximately 175,000 shares in February 1999, approximately 50,000 shares in July 1999, and another 50,000 shares in August 1999. In February 2000, Cole sold approximately 275,000 shares. In both February and November 2001, he sold 75,000 shares, and in February 2002, Cole sold approximately 500,000 shares. Cole thus sold approximately 1.2 million shares in the time period from February 1999 through February 2002. Approximately 23 percent of the sales occurred in February 2000.

As with the other defendants, Cole sold a smaller percentage of his total holdings (as defined in fn. 23, *ante*) in the allegedly suspicious period than the Ninth Circuit has held may ordinarily support an inference of scienter. (See *Metzler Inv. GMBH v. Corinthian Colleges, Inc., supra*, 540 F.3d at p. 1067.) Plaintiffs have not disputed evidence in the record that Cole retained more than one million shares of Peregrine stock—more than three times the number of shares that he sold in February 2000. This fact greatly weakens any inference of scienter. (See *In re Worlds of Wonder Securities Litigation, supra*, 35 F.3d at p. 1428.)

The analysis provided with respect to the other defendants as to the lack of probative value of the timing of their sales of stock applies equally to Cole. In addition, we cannot say that Cole's sale of 275,000 shares in February

---

[31] Although Cole does not indicate in his declaration the number of shares sold, he refers to the operative complaint, in which plaintiffs allege such information. We assume for purposes of this opinion that plaintiffs' graph is accurate.

2000 was unusual, since he also sold a large quantity of stock in February 1999 (175,000 shares) and an even larger quantity in February 2002 (500,000 shares). (Compare with *No. 84 Employer-Teamster v. America West Holding, supra,* 320 F.3d at pp. 939–940.) Finally, as noted with respect to the other defendants, because plaintiffs have included no information in their opening brief as to the price of the shares over time, they have not demonstrated that Cole's stock sales were " ' "calculated to maximize the personal benefit from undisclosed inside information." ' " (*Zucco Partners, supra,* 552 F.3d at p. 1005.)

In sum, we conclude that plaintiffs have failed to demonstrate that defendants' stock sales in February 2000 were sufficiently suspicious to raise a genuine issue of material fact as to their scienter.

> b. *Plaintiffs did not present evidence of inconsistencies between information presented to the board and Peregrine's public disclosures sufficient to create a genuine issue of material fact as to defendants' scienter*

Plaintiffs claim that the existence of inconsistencies between information presented to the board and Peregrine's public disclosures creates a genuine issue of material fact as to defendants' scienter.

### (i) *Plaintiffs' claim*

Plaintiffs cite two types of evidence in support of this claim. First, plaintiffs cite evidence that the board learned of potential concerns regarding Peregrine's accounting systems in the summer of 2001. Specifically, plaintiffs note that at a deposition, William Savoy, a member of Peregrine's board of directors and a member of the board's audit committee, testified as follows: "[T]he basic point of the meeting was Arthur Andersen [Peregrine's outside accounting firm] communicating their reconsideration of their opinion with regard to [a Peregrine transaction with] Critical Path, in particular, which gave rise to general concerns regarding Arthur Andersen's opinions of our revenue recognition policy and adherence to our policies previously."[32] Plaintiffs also note that a second member of the board and audit committee, Thomas Watrous, testified in his deposition that at a board meeting in July 2001, during a discussion regarding concerns over Peregrine's accounting systems, Watrous informed the board that he had had a conversation with Matt Gless, Peregrine's chief financial officer, in April or May of that year. Watrous stated, "I asked [Gless] whether, on a scale of 1 to 10, what were the

---

[32] Elsewhere in their brief, plaintiffs note that Peregrine's transaction with Critical Path was later determined to have had no actual economic value.

systems and procedures and polices like, just in terms of adequacy, et cetera. He said it would be, on a scale of 1 to 10, a 4 or 5." Plaintiffs claim that none of this information was disclosed to the public.

In support of their contention that there were inconsistencies between information provided to the board and Peregrine's public disclosures, plaintiffs also note that their expert witness, certified public accountant Paul Regan, provided a declaration in which he stated that Peregrine's earnings releases and SEC filings were inconsistent with materials and information that had been presented to the board, and that Peregrine's "pattern of meeting earnings expectations was inconsistent with its peer groups."

> (ii) *None of the evidence that plaintiffs cite creates a genuine issue of material fact as to defendants' scienter*

■ With respect to the auditor's and CEO's concerns regarding Peregrine's accounting procedures, plaintiffs do not identify any statements made by defendants that were inconsistent with these concerns. Rather, plaintiffs merely state in their brief that Peregrine continued to report record revenues for the subsequent quarter. Expressions of concern among members of a firm regarding the firm's accounting procedures are not inconsistent with reports of record revenue. (See *Ronconi v. Larkin, supra,* 253 F.3d at p. 434 ["A company could experience 'serious operational problems,' 'substantial difficult[ies],' and 'difficult problems' and still have increasing revenues."].) Further, no reasonable fact finder could infer scienter based on defendants' failure to disclose such "concerns" to the public, particularly in light of the fact that there was no testimony that the auditor informed the board of any actual accounting irregularities.

Plaintiffs do not articulate the manner by which Peregrine's earnings releases and financial statements were purportedly inconsistent with information that had been provided to the board. Instead, plaintiffs improperly attempt to incorporate by reference their expert's testimony on this score.[33] (See *Placer County Local Agency Formation Com. v. Nevada County Local Agency Formation Com.* (2006) 135 Cal.App.4th 793, 815 [37 Cal.Rptr.3d 729] ["We need not address this unsupported and undeveloped argument, and

---

[33] Plaintiffs' entire argument on this point in their opening brief consists of the following: "Plaintiffs submitted expert testimony about other inconsistencies in Peregrine's public disclosures. [Citation.] Specifically the expert testimony points out that 1) Peregrine's earnings statements were inconsistent with the Reviews and Outlooks [citation]; 2) Peregrine's SEC Filings were inconsistent with the Reviews and Outlooks (written reports to the board from the CEO) [citation]; and 3) Peregrine's pattern of meeting earnings expectations was inconsistent with its peer groups [citation]."

it is improper simply to incorporate by reference papers filed in the trial court."].) In any event, nothing in the cited portions of Regan's declaration suggests that the information provided to the board hinted at the employee fraud that was occurring at Peregrine. Thus, unlike the circumstances presented in the cases that plaintiffs cite in support of this claim, defendants did not receive information regarding a particular subject and later make public pronouncements that were at odds with such information. (Compare with *City of Monroe Employees v. Bridgestone* (6th Cir. 2005) 399 F.3d 651, 684 [finding a " 'divergence between internal reports and external statements on the same subject,' " where company made statement that objective data " 'clearly reinforces our belief that these are high-quality, safe tires,' " while data received by the board demonstrated serious safety concerns with tires].)[34]

Accordingly, we conclude that neither type of evidence that plaintiffs cite as representing an inconsistency between information presented to the board and Peregrine's public disclosures creates a genuine issue of material fact as to defendants' scienter.

 c. *The trial court's conclusion that evidence of various purported red flags did not create a genuine issue of material fact as to defendants' scienter was not error*

Plaintiffs contend that four purported red flags identified by Regan in his declaration demonstrate that a genuine issue of material fact exists with respect to defendants' knowledge of the fraud at Peregrine. Specifically, Regan testified that defendants were aware of "channel stuffing risks," and that the issue was discussed at many board meetings. Regan also noted that in September 1999, Peregrine's senior management informed the board that they intended to leave the company, and also informed the board that Peregrine was having "the toughest quarter we have experienced." Plaintiffs assert that, according to Regan, the existence of Peregrine's "constant cash crunch" while the company continued to meet or beat earnings expectations constituted a "red flag that something was wrong." Finally, plaintiffs contend that, according to Regan, the fact that outside auditors were able to quickly identify the fraud at Peregrine constituted a red flag.

The first three items of evidence to which Regan refers in his declaration demonstrate that the board was made aware of business challenges associated with Peregrine's distribution channels, top management's employment status, and financial liquidity. However, none of the evidence cited constitutes a red

---

[34] One could not reasonably draw an inference of scienter from the fact that Peregrine appeared to be performing better than most of its competitors.

flag as to the "fraudulent contracts," acquisitions of companies for the purpose of "hid[ing] . . . fraudulent . . . revenue," and "swap transaction[s]," which, according to plaintiffs, constitute the means by which Peregrine "engaged in a long term financial fraud." Thus, while Regan identifies in his declaration evidence of potentially problematic business issues of which the board was informed, none of the evidence cited constitutes a red flag that should have alerted defendants that Peregrine employees were engaged in the types of activities that ultimately led to the necessity to restate Peregrine's financial statements. (Cf. *Ronconi v. Larkin, supra,* 253 F.3d at p. 434 ["[p]roblems and difficulties are the daily work of business people. That they exist does not make a lie out of any . . . alleged false statements"].) With respect to the final alleged "red flag" that plaintiffs identify, the rapidity with which accountants who were hired to investigate Peregrine's accounting were able to identify the fraud, without more, does not constitute evidence that defendants knew about the fraud.

While Regan's declaration may support the conclusion that defendants were negligent in their oversight of the company, the declaration does not create a genuine issue of material fact as to defendants' knowledge of the fraud at Peregrine. With respect to problems of excessive channel inventory, Regan opined that the audit committee should have appreciated that "there was a significant degree of risk that the channel partners, like Peregrine itself, would have been unable to identify adequate end-users for resale purposes, which ultimately put the Company at risk of either having recognized revenue inappropriately or incurring losses for failure to collect the resultant receivables." With respect to Peregrine's continual problems with financial liquidity, Regan opined, "In my opinion, the Board, and the Audit Committee in particular, should have conducted [an] inquiry with management to understand why the Company was unable to demonstrate operating cash-flow." With respect to the possibility that Peregrine's top management might choose to leave Peregrine as a result of the accumulating fraud at Peregrine, Regan states, "[I]t is . . . possible that . . . members of Peregrine's Board understood this motivation."

We agree with the trial court's conclusion in its summary judgment order that, while "Regan's 54 page report documents his conclusions of all of the problems with Peregrine and what should have been done as responsible directors," his declaration does not demonstrate a genuine issue of material fact as to defendants' scienter because Regan does "not conclude that the outside directors were fraudulent [*sic*] or knew of the significant problems." Accordingly, we conclude that the trial court did not err in determining that plaintiffs' evidence of various alleged red flags does not create a genuine issue of material fact as to defendants' scienter.

### d. *Moores's receipt of an e-mail from a Peregrine employee expressing concerns about channel stuffing did not create a genuine issue of material fact as to whether defendants knew about the fraud at Peregrine[35]*

Plaintiffs note that on October 3, 2001, Moores received an e-mail from a Peregrine employee in Australia in which the employee raised concerns about certain Peregrine contracts, including the following: "Come on, what are Peregrine selling here, Amway? Vapourware? Where's the commercial substance to these so called contracts . . . Peregrine [has] booked the revenue. What will this do to Peregrine's partner's credibility? Or Stock Value . . . [T]his is a blatant example of what can be termed 'channel stuffing' in their crudest form . . . . This type of contract should immediately cease and 'real' revenue be recognized, i.e., where [the] PRODUCT is actually DELIVERED and payment is probable."

Plaintiffs contend that this e-mail "lays out that which the public learned in May 2002, but which Peregrine insiders were aware of much earlier." We disagree.

The e-mail indicates that a single Peregrine employee made an allegation in October 2001 that certain Australian Peregrine contracts lacked commercial substance. Plaintiffs do not cite any evidence indicating that Moores should have viewed the e-mail as coming from a credible source. Further, plaintiffs fail to present any argument in their brief as to how the e-mail should have alerted Moores to the entirety of the fraud at Peregrine. In short, the e-mail is far too insubstantial a foundation on which to base a finding that defendants knew about the extensive fraud at Peregrine. In light of our conclusion, we need not consider defendants' contention that the e-mail does not support plaintiffs' fraud claims because Moores forwarded the e-mail to Peregrine's CEO, who assured Moores that the claims would be investigated, notwithstanding that the claims were neither significant nor credible.[36]

### e. *Conclusion*

Whether considered individually or cumulatively, none of the evidence that plaintiffs identify in their brief raises a genuine issue of material

---

[35] Plaintiffs do not contend in their brief that Cole or Noell received the e-mail.

[36] Plaintiffs acknowledge in their brief that Moores forwarded the e-mail to the CEO, stating, "I can't figure out why the hell he is complaining. . . ." Plaintiffs also state in their brief that a Peregrine employee named Carleen Scott sent Moores an e-mail in which she stated, "I believe there are some circumstances in this situation that you may want to be aware of." However, plaintiffs do not provide any further description of Scott's e-mail or its significance. Accordingly, we conclude that plaintiffs have failed to explain how evidence of Scott's e-mail demonstrates that a reasonable fact finder could find that defendants knew about the fraud at Peregrine.

fact as to defendants' knowledge of the fraud at Peregrine. Accordingly, we conclude that plaintiffs have failed to demonstrate that the trial court erred in granting judgment as a matter of law in favor of defendants on plaintiffs' fraud and fraud-related claims, on this ground.

B. *The group published information doctrine does not apply in the context of a motion for summary judgment*

Plaintiffs contend that the trial court erred in granting judgment as a matter of law in defendants' favor on plaintiffs' fraud and fraud-related causes of action on the ground that plaintiffs failed to raise triable issues of material fact with respect to whether defendants are liable on these causes of action pursuant to the group published information doctrine. As noted previously (see fn. 4, *ante*), the doctrine, where applicable, allows a party to attribute collective statements made by a company to individual members of the company's board of directors.[37] While the trial court's summary judgment order suggests that the court concluded that plaintiffs had failed to make a sufficient evidentiary showing to rely on this doctrine in opposing defendants' motions for summary judgment, we conclude that the group published information doctrine, or group pleading doctrine, as its alternative name suggests, is a pleading device that has no application in the summary judgment context.[38]

1. *Standard of review*

The de novo standard of review outlined in part III.A.1., *ante*, applies to plaintiffs' claim that the trial court erred in failing to apply the group published information doctrine in ruling on defendants' summary judgment motion. Further, " 'If summary judgment was properly granted on any ground, we must affirm regardless of whether the court's reasoning was correct.' [Citation.]" *(County of Solano v. Handlery* (2007) 155 Cal.App.4th 566, 572 [66 Cal.Rptr.3d 201]; accord, *United Services Automobile Assn. v.*

---

[37] It is unclear from plaintiffs' opening brief which causes of action they contend must be reinstated on the basis of the group published information doctrine. In their reply brief, plaintiffs contend that the group published information doctrine applies to their negligent misrepresentation (Seventh Cause of Action) and market manipulation (§§ 25400, subd. (d), 25500) (First Cause of Action) claims. However, we assume for purposes of this opinion plaintiffs intend that this claim apply to all of their fraud or fraud-related causes of action (Fifth, Sixth, Ninth, Tenth, & Twelfth Causes of Action).

[38] The group pleading doctrine is "alternatively referred to as the 'group published' doctrine . . . ." *(In re Intelligroup Securities Litigation* (D.N.J. 2007) 527 F.Supp.2d 262, 281, fn. 8.)

*Baggett* (1989) 209 Cal.App.3d 1387, 1391 [258 Cal.Rptr. 52] ["On appeal, we are concerned with the validity of the summary judgment ruling, not its reasoning."].)[39]

### 2. *Factual and procedural background*

In his motion for summary judgment, Cole argued that he could not be held liable pursuant to the group published information doctrine because he had no role in the company beyond that of an outside director. Moores and Noell did not discuss the doctrine in their motion for summary judgment.

In their opposition to defendants' motion for summary judgment, plaintiffs argued that the record contained evidence that would support a finding that defendants were liable for market manipulation under section 25400, subdivision (d), pursuant to the group published information doctrine. Specifically, plaintiffs contended that they had established that defendants could be held liable pursuant to this doctrine because plaintiffs had presented sufficient evidence to raise a triable issue of material fact as to whether defendants had a "special relationship" with Peregrine. (*Kamen, supra,* 94 Cal.App.4th at p. 208.)

---

[39] Code of Civil Procedure section 437c, subdivision (m)(2) provides: "Before a reviewing court affirms an order granting summary judgment or summary adjudication on a ground not relied upon by the trial court, the reviewing court shall afford the parties an opportunity to present their views on the issue by submitting supplemental briefs. The supplemental briefing may include an argument that additional evidence relating to that ground exists, but that the party has not had an adequate opportunity to present the evidence or to conduct discovery on the issue. The court may reverse or remand based upon the supplemental briefing to allow the parties to present additional evidence or to conduct discovery on the issue. If the court fails to allow supplemental briefing, a rehearing shall be ordered upon timely petition of any party."

Whether our holding in this case regarding the group pleading doctrine constitutes an alternative *ground* for affirming the summary judgment, or merely different *reasoning* is debatable. (Cf. *People v. Alice* (2007) 41 Cal.4th 668, 679 [61 Cal.Rptr.3d 648, 161 P.3d 163] [construing similar provision in Gov. Code, § 68081 and concluding, "The parties need only have been given an opportunity to brief the issue decided by the court, and the fact that a party does not address an issue, mode of analysis, or authority that is raised or fairly included within the issues raised does not implicate the protections of section 68081."].) In any event, assuming that one could characterize our rejection of this claim as being based on an alternative ground for affirming the trial court's summary judgment, supplemental briefing was not required in this case because the parties have already been provided "an opportunity to present their views on the issue." (Code Civ. Proc., § 437c, subd. (m)(2).) Defendants directly addressed the issue in their briefs, and plaintiffs addressed it in their reply brief. The purpose of section 437c, subdivision (m)(2) has thus been fully met. (See *Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1147 [135 Cal.Rptr.2d 796] [concluding supplemental briefing not required pursuant to Code Civ. Proc., § 437c, subd. (m)(2) where issue was raised below and on appeal].) Further, the question whether the group pleading doctrine applies in the summary judgment context is purely a legal one; plaintiffs thus have not been denied the "opportunity to present [relevant] evidence or to conduct discovery on the issue." (Code Civ. Proc., § 437c, subd. (m)(2).)

In his reply memorandum, Cole argued that plaintiffs had failed to present sufficient evidence to hold Cole liable pursuant to the group published information doctrine as the doctrine is described by the court in *Kamen.* Specifically, Cole claimed that plaintiffs' evidence did not support a credible inference that Cole "participated in the day-to-day activities of Peregrine, or had the ability to control any activities of the other defendants or Peregrine." In their reply memorandum, Noell and Moores claimed that they were entitled to summary judgment on plaintiffs' fraud and market manipulation claims because plaintiffs had not presented sufficient evidence that Noell and Moores knew that the public financial statements on which plaintiffs based their claims were false. Noell and Moores did not directly discuss the group published information doctrine in their reply memorandum.

In its order granting summary judgment, the trial court considered the potential applicability of the group pleading doctrine to plaintiffs' fraud, market manipulation, and negligent misrepresentation claims, and concluded, "[T]he totality of the evidence is that defendants had a special relationship; however, plaintiffs have not shown how this special relationship, under the facts presented, shows access to fraudulent misrepresentations . . . ." Accordingly, the trial court concluded that plaintiffs "failed to raise a triable issue of material fact that the group pleading doctrine should be invoked . . . ."

On appeal, defendants claim that the group pleading doctrine is merely a pleading device that, where applicable, permits a plaintiff to satisfy the requirements of pleading fraud with particularity, and that the doctrine does not excuse a plaintiff from producing evidence of fraud in opposing a motion for summary judgment. In their reply brief, plaintiffs contend that a court may apply the group pleading doctrine on summary judgment to attribute to individual members of the corporation's board of directors false statements contained in collectively published corporate documents.

### 3. *Case law*

In *Kamen, supra,* 94 Cal.App.4th 197, the court considered whether the trial court had properly sustained the demurrer of three members of a corporation's board of directors on the ground that the plaintiffs had failed to adequately plead a cause of action for market manipulation under section 25500. The *Kamen* court noted that in order to be liable pursuant to section 25500, a defendant must have made "misleading statements for the purpose of inducing the purchase or sale of a security." (*Kamen, supra,* 94 Cal.App.4th at p. 199.)

■ In considering whether the plaintiffs had adequately alleged such a cause of action against the defendants, the *Kamen* court considered the potential application of the group pleading doctrine. (*Kamen, supra,* 94 Cal.App.4th at pp. 207–208.) In describing the doctrine, the *Kamen* court observed, "[I]n *Stack v. Lobo* (N.D.Cal. 1995) 903 F.Supp. 1361, the court found that the plaintiffs had not adequately pled a cause of action against certain directors of the corporation. As the court stated, 'Ordinarily, outside directors are not involved in a corporation's day-to-day affairs. Thus, the group pleading doctrine may be invoked as to outside directors only if they: 1) participated in the day-to-day management of the part of the company involved in the alleged fraud . . . or; 2) had a special relationship with the corporation.' " (*Ibid.,* fn. omitted.)

In a footnote omitted from the above quotation, the *Kamen* court further explained, " 'The Ninth Circuit has developed the group published information doctrine which it has described as follows: "In cases of corporate fraud where false and misleading information is conveyed in prospectuses, registration statements, annual reports, press releases or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers. Under such circumstances, a plaintiff fulfills the particularity requirement of [rule 9(b) of the Federal Rules of Civil Procedure (28 U.S.C.)] by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations." [Citation.] Subsequent decisions have extended the doctrine to cover not only officers but directors as well. [Citation.] "The rationale for group pleading is that facts about fraud flowing from the internal operation of a corporation are peculiarly, and often exclusively, within the control of the corporate insiders who manage the parts of the corporation involved in the fraud." ' (*In re Interactive Network, Inc. Securities Litigation* (N.D.Cal. 1996) 948 F.Supp. 917, 920.)" (*Kamen, supra,* 94 Cal.App.4th at p. 208, fn. 8.)

The *Kamen* court concluded that the trial court in that case had properly sustained defendants' demurrer, reasoning, "In the present case, plaintiffs failed to allege that [the defendants] either participated in the day-to-day management of [the corporation] or had a special relationship with the company." (*Kamen, supra,* 94 Cal.App.4th at p. 208.)

As suggested by the federal cases that the *Kamen* court quoted, the group pleading doctrine had its genesis in the pleading requirements pertaining to fraud that are contained in the Federal Rules of Civil Procedure. (See *Wool v. Tandem Computers Inc.* (9th Cir. 1987) 818 F.2d 1433.) The doctrine is

routinely described as one used to measure the sufficiency of a plaintiff's pleadings. (*In re Huffy Corp. Securities Litigation* (S.D. Ohio 2008) 577 F.Supp.2d 968, 984 [citing cases].) In *Winer Family Trust v. Queen* (3d Cir. 2007) 503 F.3d 319, 335, the United States Court of Appeals for the Third Circuit described the doctrine as follows: "The group pleading doctrine is a judicial presumption that statements in group-published documents including annual reports and press releases are attributable to officers and directors who have day-to-day control or involvement in regular company operations. Under the doctrine, where defendants are insiders with such control or involvement, their specific connection to fraudulent statements in group-published documents is unnecessary. [Citation.] Accordingly, the group pleading doctrine allows a plaintiff to plead that defendants made a misstatement or omission of a material fact without pleading particular facts associating the defendants to the alleged fraud."

The doctrine is far from universally accepted, particularly in the wake of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 et seq. (PSLRA), in which Congress enacted heightened pleading requirements for securities class action lawsuits. (See *Winer Family Trust v. Queen, supra*, 503 F.3d at pp. 335–336; see also *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* (2007) 551 U.S. 308, 326, fn. 6 [168 L.Ed.2d 179, 127 S.Ct. 2499, 2511, fn. 6] (*Tellabs*) ["there is disagreement among the Circuits as to whether the group pleading doctrine survived the PSLRA . . ."].)

### 4. *Application*

There are no reported California cases in which a court has applied the group pleading doctrine in the context of a motion for summary judgment. In *Kamen*—the only California published case to discuss the group pleading doctrine—the court applied the doctrine to determine the adequacy of the plaintiff's pleadings.[40] (*Kamen, supra*, 94 Cal.App.4th at p. 208.) The *Kamen* court noted that the doctrine had evolved in response to the requirement contained in rule 9(b) of the Federal Rules of Civil Procedure (28 U.S.C.) that fraud be pleaded with particularity. (*Kamen, supra*, 94 Cal.App.4th at pp. 207–208.) Courts in numerous federal cases describe the doctrine as one that is used to measure the sufficiency of the plaintiff's pleadings. (See, e.g., *Winer Family Trust v. Queen, supra*, 503 F.3d at p. 335.)

The rationale for the doctrine that the *Kamen* court suggests, i.e., the difficulty of obtaining information regarding the perpetrators of corporate fraud, clearly applies in the pleading context. (See *In re Interactive Network,*

---

[40] Although *Kamen* involved only a market manipulation cause of action (*Kamen, supra*, 94 Cal.App.4th at p. 199), we assume for purposes of this opinion that the group pleading doctrine may also apply to negligent misrepresentation and fraud claims under California law.

*Inc. Securities Litigation, supra,* 948 F.Supp. 917, 921 ["The doctrine was developed to relieve plaintiffs [of] the burden of pleading exactly which members of an organization were responsible for publications of the organization in those circumstances where their access to information was particularly limited."].) The rationale for invoking the doctrine is less compelling in the context of a summary judgment, in which discovery is complete. (Cf. *Winer Family Trust v. Queen, supra,* 503 F.3d at p. 337 ["If a private securities case proceeds past the pleadings stage against a corporation and discovery reveals individual culpability, a plaintiff may seek permission to amend the complaint to assert claims against individual defendants."].)

Plaintiffs correctly note that at least one federal district court, in an unpublished decision, relied on the group published information doctrine in denying a motion for summary judgment brought by the chairman of a board of directors. (See *Golden v. Terre Linda Corp.* (N.D.Ill., July 26, 1996, No. 95 C 0657) 1996 WL 426760, p. *5 (*Golden*).) Plaintiffs also note that a second federal district court has suggested that the doctrine applies in the summary judgment context. The court stated, "On summary judgment, a defendant may rebut the group pleading presumption by producing evidence that he had no involvement in creating the challenged document." (*In re Silicon Graphics, Inc. Securities Litigation* (N.D.Cal. 1997) 970 F.Supp. 746, 759 (*In re Silicon Graphics*).)

However, neither the *Golden* court nor the court in *In re Silicon Graphics* provided any analysis of the propriety of applying the group published information doctrine in the context of a summary judgment motion. Further, the case on which the *Golden* court relied, *Blake v. Dierdorff* (9th Cir. 1988) 856 F.2d 1365, 1370, applied the doctrine in considering the sufficiency of the allegations in the plaintiff's complaint. Similarly, the *In re Silicon Graphics* court relied on dicta from another pleadings case, *In re 3Com Securities Litigation* (N.D.Cal. 1990) 761 F.Supp. 1411, 1414, in suggesting that the group pleading doctrine operates as an evidentiary presumption in the summary judgment context. At least one commentator has sharply criticized the reasoning of both *Golden* and *In re Silicon Graphics*. (See Fisher, *Don't Call Me a Securities Law Groupie: The Rise and Possible Demise of the "Group Pleading" Protocol in 10B-5 Cases* (2001) 56 Bus. Law. 991, 1028 & fns. 118, 119 ["Some decisions, however, either misunderstand the 'group pleading' concept or wrongly expand upon it, (i) by apparently transmuting it into a rule of substantive law applicable on summary judgment motions [citing *Golden, supra,* 1996 WL 426760]; (ii) [or] by converting this pleading presumption into a rebuttable evidentiary presumption . . . [citing *In re Silicon Graphics, supra,* 970 F.Supp. 746] . . . ." (fns. omitted)].)

Neither *Golden* nor *In re Silicon Graphics* constitutes binding precedent on the issue whether the group pleading doctrine applies in the summary adjudication of California state law claims. (See *Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 69 [74 Cal.Rptr.3d 108, 179 P.3d 905].) As noted above, there is no California authority applying the doctrine in the summary judgment context, and plaintiffs do not cite any federal appellate authority holding that the group pleading doctrine may serve as the basis for defeating a motion for summary judgment in cases involving federal law. In contrast, as noted above, a number of federal appellate courts have explained that the rationale for the doctrine arises only in the context of determining the sufficiency of a plaintiff's pleadings. (See, e.g., *Winer Family Trust v. Queen, supra,* 503 F.3d at p. 335.) Further, the debate within the federal courts surrounding the continued validity of the group pleading doctrine in the wake of changes in pleading requirements adopted by the PSLRA (*Tellabs, supra,* 551 U.S. at p. 326, fn. 6 [127 S.Ct. at p. 2511, fn. 6]), supports the conclusion that the doctrine is one that applies, if at all, only in determining the sufficiency of a plaintiff's pleadings.

■ We conclude that the group pleading doctrine does not apply in determining whether a party has presented sufficient evidence of its claims to avoid summary judgment under California law. We therefore further conclude that the trial court properly determined that the group pleading doctrine did not apply to create a disputed issue of material fact in this case.

C. *The trial court did not err in sustaining Noell's and Moores's demurrers to plaintiffs' section 25504 claim in plaintiffs' second amended complaint*

Plaintiffs claim that the trial court erred in sustaining Noell's and Moores's demurrers to plaintiffs' section 25504 claim. We conclude that plaintiffs have failed to provide an adequate record to permit appellate review of this claim.[41]

1. *Factual and procedural background*

■ Plaintiffs filed a first amended complaint against defendants in which plaintiffs alleged, among other causes of action, that defendants were liable pursuant to section 25504.[42] Section 25504 establishes civil liability for every

---

[41] Based on the limited record that we do have regarding this issue, the claim appears to have no merit.

[42] The record on appeal does not contain the first amended complaint.

person who "directly or indirectly controls a person liable under Section 25501 or 25503 . . . ." Section 25501, in turn, establishes liability for persons who violate section 25401, which generally prohibits making untrue statements in the purchase or sale of securities.[43]

Defendants each filed separate demurrers to plaintiffs' first amended complaint.[44] On July 8, 2004, the trial court entered an order granting defendant Cole's demurrer with leave to amend, on the ground that the allegations of the first amended complaint were conclusory. In the same order, the court stated, "The demurrers to the fourth cause of action against the Peregrine defendants [including Moores and Noell] are overruled for violation of [section] 25504 (control person liability for Peregrine's violations of [§] 25401). Plaintiffs have alleged sufficient facts to show that these defendants had control of day-to-day activities of Peregrine."

On October 28, 2004, the trial court entered a tentative order granting defendants Moores's and Noell's motions for reconsideration. Neither the motions nor the opposition to the motions is in the record on appeal. In its tentative order, the court further stated, "The demurrers of defendants [Moores] and [Noell] to the fourth cause of action [for a violation of § 25504] are sustained, with leave to amend, only if plaintiffs can establish they purchased their stock directly from defendants." The court noted that it had inadvertently overlooked the privity requirement for a section 25504 cause of action in its July 8, 2004 order.

On November 15, 2004, the court stated that it had considered the motions to reconsider, the opposition to the motions, and Moores's and Noell's demurrers to the second amended complaint.[45] The appellate record does not contain the briefing on the motions for reconsideration, the second amended complaint, or Moores's or Noell's demurrers thereto. In the November 15 order, the court also confirmed its tentative ruling sustaining the demurrers with leave to amend.

In December 2005, plaintiffs filed a fourth amended complaint. This complaint alleged a cause of action against Cole for a violation of section 25504. The complaint stated, "THE PEREGRINE DEFENDANTS were each

---

[43] Section 25503, which does not appear to have any relevance to this case, establishes liability for persons who violate other sections of the Corporations Code, and specifies the damages that a plaintiff may recover for such violations.

[44] Those demurrers also are not contained in the record. Cole apparently also joined in Moores's demurrer.

[45] In its November 15 order, the trial court referred to a single "Motion to Reconsider." However, in its tentative order, the court indicated that Moores and Noell had each filed a motion for reconsideration.

control persons of PEREGRINE and each other as defined by Corporations Code [section] 25504 and caused PEREGRINE to commit violations of Corporations Code [section] 25400 and [section] 25402, and are therefore jointly and severally liable with PEREGRINE." The claim also stated, *"This cause of Action is Only Pleaded Against . . . Cole, Based on this Court's Order of November 15, 2004. Plaintiffs Reserve All Rights for Appeal."*

On February 15, 2006, the trial court entered a dismissal, without prejudice, of the fourth cause of action alleging a violation of section 25504 against Cole, pursuant to a stipulation of the parties. The stipulation and order essentially provide that in the event of a reversal of the November 14, 2004 order[46] sustaining the demurrers of Moores and Noell to plaintiffs' section 25504 claim, the order of dismissal of the section 25504 cause of action against Cole would be vacated.

### 2. *Standard of review*

"In evaluating a trial court's order sustaining a demurrer, we review the complaint de novo to determine whether it contains sufficient facts to state a cause of action. [Citation.]" *(Peterson v. Cellco Partnership* (2008) 164 Cal.App.4th 1583, 1589 [80 Cal.Rptr.3d 316].) Further, "we review the trial court's result for error, and not its legal reasoning. [Citation.]" *(Davies v. Sallie Mae, Inc.* (2008) 168 Cal.App.4th 1086, 1090 [86 Cal.Rptr.3d 136].) Finally, "It is well settled . . . that a party challenging a judgment has the burden of showing reversible error by an adequate record." *(Ballard v. Uribe* (1986) 41 Cal.3d 564, 574 [224 Cal.Rptr. 664, 715 P.2d 624].)

### 3. *Application*

Plaintiffs seek reversal of the trial court's November 15, 2004 order sustaining Noell's and Moores's demurrers to plaintiffs' second amended complaint.[47] However, plaintiffs have failed to include in the record either the operative complaint or the demurrers, thus making it impossible for this court to review the complaint de novo to determine whether it states a cause of action. On that basis alone, we must reject plaintiffs' claim. (See *Ballard v. Uribe, supra*, 41 Cal.3d at p. 574.)

---

[46] The parties were referring to the court's November *15*, 2004 order.

[47] On November 15, 2004, the trial court granted Noell's and Moores's motions for reconsideration of its July 8, 2004 order in which it overruled Noell's and Moores's demurrers to the *first* amended complaint. In addition, the court sustained, with leave to amend, Noell's and Moores's demurrers to plaintiffs' *second* amended complaint. As noted previously, none of these demurrers or complaints are in the record.

Plaintiffs assert in their brief, consistent with the plain language of section 25504, that "To establish control person liability under [section] 25504, plaintiffs must plead that defendants were in control of a person liable under [sections] *25501, 25503*."[48] (Italics added.) However, the only complaint that is in the record—the fourth amended complaint—does not allege that any defendant was in control of a person liable pursuant to section 25501 or 25503.[49] Rather, plaintiffs allege in the fourth amended complaint that Cole is liable for a violation of section 25504 based on Peregrine's alleged violations of sections *25400* and *25402*. Plaintiffs provide no argument or authority to the effect that a plaintiff may establish control person liability pursuant to section 25504 for a company's violations of sections 25400 or 25402. Thus, even assuming that plaintiffs' second amended complaint contained allegations as to all defendants identical to those contained in the fourth amended complaint as to Cole, plaintiffs still have failed to demonstrate that they have, or could have, stated a section 25504 claim.

■■■ Finally, even assuming that plaintiffs had provided an adequate record of their claims, and assuming further that plaintiffs had alleged that one or more of the defendants were liable pursuant to section 25504 for Peregrine's violations of section *25501*, plaintiffs concede that "privity is required between the buyer and seller under [section] 25501. . . ." (*In re ZZZZ Best Securities Litigation* (C.D.Cal., July 23, 1990, No. CV 87-3574 RSWL) 1990 WL 132715, p. *17 ["controlled party is the one who must be in privity with the plaintiffs, not the controlling person"].) However, plaintiffs have not alleged, or demonstrated that they could allege, that they purchased stock from Peregrine. Thus, assuming that the trial court erred in suggesting in its July 8, 2004 order that plaintiffs were required to allege that they purchased securities from *defendants*, rather than from *Peregrine*, plaintiffs have not demonstrated that they could allege that they purchased securities from Peregrine.[50] Plaintiffs have thus failed to demonstrate that they could amend their complaint to allege that defendants were in control of a person liable under section 25501 or 25503, as plaintiffs themselves acknowledge is required for section 25504 liability to potentially attach. (See *Davies v. Sallie Mae, Inc.*, *supra*, 168 Cal.App.4th at p. 1090 ■■■ [" 'The *plaintiff has the burden* of

---

[48] As noted previously, section 25504 establishes liability for a person who "directly or indirectly controls a person liable under Section 25501 or 25503 . . . ."

[49] We omit any further discussion of section 25503, since there is nothing in plaintiffs' brief that suggests that plaintiffs ever sought to predicate their section 25504 claim on liability established under section 25503. Based on the trial court's July 8, 2004 order, it appears that plaintiffs may have predicated their section 25504 claim in their first amended complaint on alleged liability under 25501 for an alleged violation of section 25401.

[50] Plaintiffs do not contest Noell and Moores's assertion in their appellate brief that plaintiffs "purchased their stock on the open market, *not* directly from [defendants] *or* Peregrine."

proving that an amendment would cure the defect' "].) We therefore affirm the trial court's November 15, 2004 order and its related February 15, 2006 order.

### D. *The trial court did not abuse its discretion in refusing to stay the proceedings*

Plaintiffs claim that the trial court erred in denying their motion to stay the case. We review the trial court's denial of plaintiffs' motion for a stay under the abuse of discretion standard of review. (See *Avant! Corp. v. Superior Court* (2000) 79 Cal.App.4th 876, 889 [94 Cal.Rptr.2d 505] (*Avant!*) [applying abuse of discretion standard of review in determining whether trial court erred in denying party's motion to stay proceedings in light of pending related criminal proceeding].)

#### 1. *Factual and procedural background*

On or about September 4, 2007, plaintiffs filed a memorandum of points and authorities in support of a request to stay all proceedings in the case.[51] In their motion for a stay, plaintiffs requested that the court stay all proceedings in the case for a period of one year, or "until the primary witnesses who are unavailable due to the parallel criminal action are available." In their motion, plaintiffs noted that they had concurrently filed an affidavit seeking to continue the hearing on defendants' motions for summary judgment in order to allow plaintiffs to obtain additional evidence pursuant to Code of Civil Procedure section 437c, subdivision (h).[52]

The gist of both the motion to stay the proceedings and the affidavit to continue the summary judgment hearing was that plaintiffs had been unable to gather important evidence from 28 witnesses, such as "key [Peregrine] employees and outside auditors. . . ." Plaintiffs noted that they had been unable to gather this evidence because these witnesses were exercising their privilege against self-incrimination and had refused to provide "any substantive testimony," in view of pending or potential criminal proceedings concerning the witnesses' knowledge of and/or participation in the fraud at Peregrine. Plaintiffs claimed that it would be unfair to force them to trial

---

[51] The file-stamped copy of the memorandum is not in the record. Further, no motion to stay is contained in the record. We refer to the memorandum in support of the motion to stay as the motion to stay.

[52] Code of Civil Procedure section 437c, subdivision (h) provides: "If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication or both that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make any other order as may be just. The application to continue the motion to obtain necessary discovery may also be made by ex parte motion at any time on or before the date the opposition response to the motion is due."

without the unavailable witnesses' evidence, and that it would be "patently unfair" to dismiss their case for having failed to bring the case to trial within five years pursuant to Code of Civil Procedure section 583.310.[53]

Defendants filed a joint opposition to plaintiffs' motion to stay the proceedings.[54] In their opposition, defendants contended that plaintiffs had identified nothing in the voluminous discovery already undertaken that demonstrated that defendants had been aware of the ongoing fraud, nor had plaintiffs identified anything that suggested that they could uncover such evidence if witnesses who were asserting their Fifth Amendment rights were to provide testimony in the case. Defendants asserted that they had a strong interest in concluding the litigation, and claimed that they would be prejudiced if the court were to enter an "indefinite stay." Defendants noted that they had already produced documents and had been deposed, and that plaintiffs' request for a stay was premised on nothing more than the "hope that material allegations not otherwise supported by a large and rich record will find support if and when witnesses with non-unique perspectives cease to assert their privilege against self-incrimination."

The trial court held a hearing on plaintiffs' motion to stay the proceedings and their motion to continue the hearing on defendants' motions for summary judgment. After hearing argument from all counsel, the court confirmed its tentative ruling denying both motions.[55]

In denying the motion for a stay, the trial court noted that the case had been pending since February 2003, and that the court had granted previous requests by plaintiffs to continue the summary judgment proceedings. The court also noted that it had stayed the case for "multiple-year periods of time at the request of various parties . . . ." The trial court remarked that in delaying the proceedings on previous occasions, the court had acted with the hope that the parallel criminal proceedings would be "somewhere close to resolution," and added that "the criminal proceeding is still ongoing and when it will be completed is, I think, at best, speculative." The court further noted that some witnesses might not be available to provide substantive testimony in this case for as long as 10 years, given the applicable statutes of limitations on various potential criminal charges.

The court stated:

---

[53] In their motion to stay, plaintiffs noted that the five-year deadline was approximately one year away and that granting their motion would toll the running of the five-year period.

[54] Noell and Moores also filed a joint opposition, and Cole filed a separate opposition, to plaintiffs' affidavit in support of their request to continue the summary judgment proceedings.

[55] The record on appeal does not contain the court's tentative ruling.

"I believe that we have reached the point in this case where the balance has swung in favor of moving forward with the litigation. The factors in [*Pacers, Inc. v. Superior Court* (1984) 162 Cal.App.3d 686, 689 [208 Cal.Rptr. 743]] in terms of prejudice to those who may have to choose whether to exercise a Fifth Amendment privilege at the risk of financial penalty in the civil case has been a factor that's caused me to continue this case in the past, but counter-balancing that is the concern and right of those charged with significant wrongdoing, including fraud and punitive damages allegations to have a day in court.

"All the cases recognize the court's discretion under these circumstances, and also the cases note, particularly, the [*Fuller v. Superior Court* (2001) 87 Cal.App.4th 299 [104 Cal.Rptr.2d 525]] case, the factors that are also at play in terms of the Delay Reduction Act [Gov. Code, § 68600 et seq.] and moving cases forward.

"The fact [is] that over time there's loss of memory, and thus, evidence, witnesses become unavailable either personally and/or by way of loss of memory and other evidence becomes more difficult to obtain or is lost. Under the entirety of the circumstances of this case, it does not appear to me that granting a stay for an additional year would get us anywhere meaningful [*sic*] in this case. I think we'd be where we are now after me having granted numerous stays in the past where the criminal process will be ongoing."

In denying plaintiffs' request to continue the summary judgment proceedings, the trial court ruled that plaintiffs had failed to establish the nature of the evidence that they contended was unavailable. The court also stated that plaintiffs had failed to demonstrate that there was a reasonable likelihood that such evidence actually existed, noting that voluminous discovery had already been undertaken, unimpeded by the criminal proceedings. The court further noted that "a great deal of information" had been generated regarding all of the "key periods" in the case, and that plaintiffs had still failed to demonstrate with "any specificity as to exactly who and what would be disclosed," if the court were to continue the hearing on defendants' motion for summary judgment.[56]

### 2. *The law governing the issuance of stays of civil proceedings in light of pending related criminal proceedings*

In *Pacers, Inc. v. Superior Court, supra,* 162 Cal.App.3d at page 689 (*Pacers*), defendants in a civil suit faced with a potential criminal proceeding

---

[56] Plaintiffs have not raised any claim on appeal regarding the trial court's denial of their motion to continue the summary judgment proceeding. Plaintiffs challenge only the trial court's denial of their motion to stay the proceedings.

arising out of the same alleged underlying incident sought to stay the taking of their depositions for approximately two years, when the statute of limitations for potential criminal charges would have lapsed. The *Pacers* court concluded that the trial court erred in denying defendants' request, reasoning, "An order staying discovery until expiration of the criminal statute of limitations would allow real parties to prepare their lawsuit while alleviating petitioners' difficult choice between defending either the civil or criminal case." (*Id.* at p. 690; see also *Fuller v. Superior Court, supra*, 87 Cal.App.4th 299 [discussing request for stay of deposition by defendant who invokes his privilege against self-incrimination during discovery in civil litigation to avoid exposure to criminal prosecution].)

 In *Avant!, supra*, 79 Cal.App.4th 876, a corporate defendant in a civil action sought a stay of proceedings during the pendency of a related criminal proceeding in which the corporation, as well as several of its current or former employees, were defendants. In concluding that the trial court had not abused its discretion in denying the motion to stay, the *Avant!* court listed the factors that a trial court should consider in ruling on such a motion: " 'The decision whether to stay civil proceedings in the face of a parallel criminal proceeding should be made "in light of the particular circumstances and competing interests involved in the case." [Citation.] This means the decisionmaker should consider "the extent to which the [party seeking the stay's] fifth amendment rights are implicated." [Citation.] In addition, the decisionmaker should generally consider the following factors: (1) the interest of the [party opposing the stay] in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to [the party opposing the stay] of a delay; (2) the burden which any particular aspect of the proceedings may impose on [the party seeking the stay]; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interests of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal litigation. [Citation.]' [Citation.]" (*Id.* at p. 885.)[57]

With regard to the corporation's interests, the *Avant!* court noted that the corporation itself did not have any Fifth Amendment interests to protect. The court stated that the employees' interests in staying the proceedings were not to be "reviewed on Fifth Amendment grounds, but on abuse of discretion grounds, even where the employees are the defendants and the requests for admission and interrogatory are directed to those employees." (*Avant!, supra*, 79 Cal.App.4th at p. 886.) The *Avant!* court observed that the trial court had

---

[57] In *Avant!*, the defendant sought the stay and the plaintiff opposed the defendant's request. (*Avant!, supra*, 79 Cal.App.4th at p. 885.) For the sake of clarity, given the procedural posture of this case, we have substituted the phrases "party seeking the stay" and "party opposing the stay" for "defendant" and "plaintiff" as appropriate within the quoted text.

protected against any potential infringement on the employees' privileges against self-incrimination by limiting the scope of the plaintiffs' discovery requests to nonprivileged information. (*Id.* at pp. 886–887.)

With regard to the interest of the party opposing the stay, the *Avant!* court stated, "[T]here is hardly a question of the interest of [the party opposing the stay] in proceeding expeditiously with this litigation or any particular aspect of it," and observed that granting a stay would " 'would increase the danger of prejudice resulting from the loss of evidence, including the inability of witnesses to recall specific facts, or the possible death of a party.' [Citation.]" (*Avant!, supra,* 79 Cal.App.4th at p. 887.) The *Avant!* court continued, "Clearly, denial of the stay motion promotes the convenience of the court in the management of its cases." (*Id.* at p. 888.) Finally, the court noted that denial of the request for a stay promoted the public's interest in maintaining "a system that encourages individuals to come to court for the settlement of their disputes." (*Id.* at p. 889.)

*Pacers, Fuller,* and *Avant!* each involved a defendant or defendants who were facing potential criminal prosecution and sought to stay pending parallel civil litigation. The parties have not cited, and we are not aware of, any California authority that involves a plaintiff's motion to stay litigation against a defendant in order to allow the plaintiff to attempt to obtain evidence from witnesses (or other defendants) who have invoked their privilege against self-incrimination. Plaintiffs in this case cite *County of Orange v. Superior Court* (2000) 79 Cal.App.4th 759 [94 Cal.Rptr.2d 261] (*County of Orange*), in which the parents of a murdered child brought an action that included claims for defamation and civil rights violations against the county and its sheriff's department arising from the criminal investigation into the murder. (*Id.* at p. 762.) While the murder remained unsolved, the parents alleged that the sheriff's department had publicly indicated that the parents were suspects in the murder. (*Ibid.*) Three days after filing their complaint, the parents sought "[i]n effect . . . the sheriff's entire investigative file relating to [the child's] murder." (*Ibid.*) The county refused to produce the file, contending that its contents were protected by the official information privilege codified in Evidence Code section 1040, subdivision (b)(2). (*County of Orange, supra,* 79 Cal.App.4th at pp. 762–763.) On the parents' motion to compel, the trial court ordered that the file be produced. (*Id.* at p. 763.) The county sought writ relief from the Court of Appeal. (*Ibid.*)

In issuing a writ of mandate to prevent disclosure of the file, the *County of Orange* court noted that "[T]he contents of police investigative files sought in civil discovery must remain confidential so long as the need for confidentiality outweighs the benefits of disclosure in any particular case." (*County of Orange, supra,* 79 Cal.App.4th at p. 765.) In considering whether the need

for confidentiality continued to exist in that case, the *County of Orange* court stated: "We conclude on the record before us that the public interest in solving [the child's] homicide and bringing the perpetrator(s) to justice outweighed the [parents'] interest in obtaining the discovery sought, at least at the time this matter was considered below. We recognize the rather arbitrary nature of this conclusion, but the order we review was made less than a year after this civil action was filed." (*Id.* at p. 767.)

The *County of Orange* court also commented that rather than immediately providing the parents with the contents of the file, the trial court should have stayed discovery or, if necessary, stayed the action, in order to allow the county the opportunity to investigate the murder: "The appropriate remedy in this case is for the trial court to stay discovery of investigative information in the civil action in order to allow the sheriff's department the necessary time to investigate. (*Pacers*, [*supra*,] 162 Cal.App.3d [at p. 690] . . . .) And, should that become necessary, the trial court should stay the entire action in the interest of justice to avoid a potential statutory dismissal. [Citation.] We are cognizant of the [parents'] concern that the County not be allowed to 'immunize [itself from] any lawsuit by the [parents] forever simply by keeping the case open.' Our order is intended to preserve the confidentiality of the investigative file for some reasonable period of time, but not forever." (*County of Orange, supra*, 79 Cal.App.4th at p. 768.)

The *County of Orange* court reasoned that after a reasonable period of time, "the balance will have swung in favor of giving the [parents] limited access to that information in the file which may help develop their case against the County. In other words, with the passage of time, changing circumstances will inevitably reverse the balance of competing interests under [Evidence Code] section 1040, subdivision (b)(2)." (*County of Orange, supra*, 79 Cal.App.4th at pp. 768–769, italics omitted.)

3. *Application*

In their opening brief on appeal, plaintiffs argue in a conclusory fashion that the trial court "failed to fashion any remedy to meet the needs of the plaintiffs," by allowing defendants to "force plaintiffs to trial without the evidence from any of the key auditors or management who attended the board meetings."[58] However, plaintiffs provide no argument regarding specific evidence that they contend was unavailable to them (failing to provide in their opening brief even the names of witnesses whose testimony

---

[58] The trial court's ruling did not have the effect of forcing plaintiffs to trial, given that the court subsequently granted defendants' motion for summary judgment. Further, plaintiffs have not appealed the trial court's denial of their request to continue the summary judgment proceedings.

they were unable to obtain), and do not address the likelihood that the related criminal proceedings would be resolved within a reasonable period of time so as to allow plaintiffs to obtain such evidence. Plaintiffs also do not discuss the alleged inadequacy of the other discovery they obtained in the case.[59] Plaintiffs have failed to demonstrate that evidence favorable to their position even exists. (See *Birge ex rel. Mickens v. Dollar General Corp.* (W.D.Tenn., Dec. 14, 2005, No. 04-2531 BP) 2005 WL 3448044, p. *4 [denying company's motion to stay proceeding until the resolution of related criminal proceeding where "there is simply no indication whether the 'unavailable evidence,' that is, the criminal defendants' testimony . . . will be favorable or unfavorable to [proponent of stay]"].)

Plaintiffs also fail to address the reasons the trial court gave for denying the motion to stay (see pt. III.D.1., *ante*), and thus fail to demonstrate that the trial court abused its discretion. In addition, applying the *Avant!, supra*, 79 Cal.App.4th 876, factors to this case reveals that plaintiffs have no Fifth Amendment interests to protect, defendants' interest in proceeding with the litigation had become weightier given the length of time the case had been pending, plaintiffs failed to articulate with any particularity the burden they would face if the case were not stayed, and the interests of both the general public and the trial court in expeditiously dispensing justice weighed against further delaying the proceedings. (*Id.* at p. 885.)

There is no California authority that even remotely suggests that the trial court abused its discretion under the circumstances of this case. The case on which plaintiffs rely most heavily, *County of Orange, supra*, 79 Cal.App.4th 759, 768, endorsed a temporary stay so that plaintiffs who had been named as suspects in a murder investigation would not obtain access to the contents of the prosecution's criminal investigatory file through civil discovery. Nothing in that case suggests that a plaintiff is entitled to a stay of litigation based upon the difficulty of obtaining evidence from witnesses who are invoking their Fifth Amendment rights.

We conclude that the trial court did not abuse its discretion in denying plaintiffs' motion to stay the proceedings.

---

[59] Plaintiffs' opening brief on appeal was 13,938 words in length, just shy of the 14,000-word limitation that ordinarily applies in civil appeals. (Cal. Rules of Court, rule 8.204(c)(1).) However, such word limitations do not relieve a party of the requirement to adequately brief any argument that the party raises on appeal. Further, a party may file an application seeking permission to file a longer brief upon a showing of good cause. (Cal. Rules of Court, rule 8.204(c)(5).) Plaintiffs filed no such application in this case.

## IV.

## DISPOSITION

The judgment is affirmed.

McConnell, P. J., and Huffman, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 8, 2009, S172585.