Filed 11/21/18; Certified for publication 12/18/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MELISSA CASE,<br><br>      Plaintiff and Appellant,<br><br>    v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE CO., INC.,<br><br>      Defendant and Respondent. | B281732<br><br>(Los Angeles County Super. Ct. No. BC583311) |

      APPEAL from a judgment of the Superior Court of Los Angeles County, Malcolm H. Mackey, Judge. Affirmed.

      Phillips & Associates, John W. Phillips, and Patrick Phillips for Plaintiff and Appellant.

      Shaver, Korff & Castronovo and Michael J. O'Neill for Defendant and Respondent.

_____

In the underlying action, appellant Melissa Case asserted claims for breach of insurance contract and bad faith against respondent State Farm Mutual Insurance Company, Inc. (State Farm), and requested an award of punitive damages. The trial court granted summary adjudication in State Farm's favor on each claim and on the request for punitive damages. We affirm.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The following facts are not in dispute: In March 2013, Case was employed by Lawry's Restaurant, and insured under a personal automobile policy issued by State Farm. The policy's uninsured-underinsured motorist (UM) coverage for bodily injury was $100,000 per person and $300,000 per accident. On March 29, 2013, while returning to Lawry's Restaurant from an off-site catering location, Case was injured in a car accident involving an uninsured driver. The next day, she sought workers' compensation benefits through her employer's policy and submitted a claim to State Farm under her personal automobile policy. In 2014, after Case submitted a demand for UM policy benefits, State Farm sought verification of a "final lien" relating to medical expenses incurred as workers' compensation benefits. When State Farm failed to pay UM benefits, Case requested arbitration.

On May 28, 2015, Case initiated the underlying action against State Farm for breach of an insurance contract and bad faith. The complaint asserted that State Farm acted improperly in delaying arbitration and settlement of Case's claim for UM benefits, alleging that although she verified a final workers' compensation lien relating to medical expenses no later than November 2014, State Farm neither paid her claim for UM

2

benefits nor undertook arbitration. The complaint requested compensatory and punitive damages.

In September 2015, Case submitted information to State Farm showing that she had exhausted the possibility of receiving additional payments through the workers' compensation system. In November 2015, State Farm and Case settled her claim for UM benefits for $35,000.

In December 2016, State Farm sought summary judgment or adjudication on Case's claims. State Farm requested summary adjudication on the claim for breach of the insurance contract, contending it had provided all policy benefits due Case. Furthermore, relying on *Rangel v. Interinsurance Exchange* (1992) 4 Cal.4th 1 (*Rangel*), State Farm contended the bad faith claim failed, arguing that it breached neither the policy nor the implied covenant of good faith by declining to pay or arbitrate Case's UM claim before her claim for workers' compensation benefits had been resolved. In view of the purported defects in the claims for breach of an insurance contract and bad faith, State Farm maintained that summary adjudication was proper with respect to Case's request for punitive damages.

The trial court granted summary judgment, concluding that summary adjudication was proper with respect to Case's claims and her request for punitive damages. On March 6, 2017, the court entered a judgment in favor of State Farm and against Case. This appeal followed.

## DISCUSSION

Case contends the trial court erred in granting summary judgment. For the reasons explained below, we disagree.

A.  *Standard of Review*

"A summary adjudication motion is subject to the same rules and procedures as a summary judgment motion.  Both are reviewed de novo.  [Citations.]" (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819.)  "A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.  [Citation.]" (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107.)  Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)  In moving for summary judgment, "all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action -- for example, that the plaintiff cannot prove element *X*." (*Id.* at p. 853, fn. omitted.)

Although we independently assess the grant of summary judgment, our review is governed by a fundamental principle of appellate procedure, namely, that "'[a] judgment or order of the lower court is presumed correct,'" and thus, "'error must be affirmatively shown.'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564, quoting 3 Witkin, Cal. Procedure (1954) Appeal, § 79, pp. 2238-2239, italics omitted.)  Under this principle, Case bears the burden of establishing error on appeal, even though State Farm had the burden of proving its right to summary judgment before the trial court. (*Frank and Freedus v. Allstate Ins. Co.* (1996) 45 Cal.App.4th 461, 474.)  For this reason, our review is

limited to contentions adequately raised in Case's briefs. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125-126.)

B.    *Governing Principles*

Generally, "[a]n insured can pursue a breach of contract theory against its insurer by alleging the insurance contract, the insured's performance or excuse for nonperformance, the insurer's breach, and resulting damages." (*San Diego Housing Com. v. Industrial Indemnity Co.* (1998) 68 Cal.App.4th 526, 536.)  In view of the requirement for contract-related damages, an insurer may secure summary adjudication on the claim when there are no unpaid policy benefits.  (*Behnke v. State Farm General Ins. Co.* (2011) 196 Cal.App.4th 1443, 1468.)

To establish bad faith, a policy holder must demonstrate misconduct by the insurer more egregious than an incorrect denial of policy benefits.  "The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing." (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720 (*Wilson*).)  The obligation imposed on the insurer under the covenant "'is not the requirement mandated by the terms of the policy itself . . . .  It is the obligation . . . under which the insurer must act fairly and in good faith in discharging its contractual responsibilities.'" (*California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 54, quoting *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 573-574, italics omitted.)  In the context of a bad faith claim, "an insurer's denial of or delay in paying benefits gives rise to tort damages only if the insured shows the denial or delay was unreasonable." (*Wilson*, *supra*, 42 Cal.4th at p. 723.)

Under this standard, "an insurer denying or delaying the payment of policy benefits due to the existence of a genuine

5

dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith[,] even though it might be liable for breach of contract." (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 347.) That is because "whe[n] there is a genuine issue as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute." (*Ibid.*, italics deleted.)

Here, the key issues concern State Farm's conduct regarding Case's claim for UM benefits, which she pursued while seeking workers' compensation benefits. Under Insurance Code section 11580.2 (section 11580.2), automobile insurance policies must offer UM coverage and provide for binding arbitration of certain disputes relating to UM benefits. (Ins. Code, § 11580.2, subds. (a), (f), (p); *Rangel, supra*, 4 Cal.4th at pp. 7-8.) The scope of the mandated arbitration is limited: absent an agreement between the insured and the insurer, only the uninsured driver's liability and the amount of damages caused by the uninsured driver are subject to arbitration; other issues -- including coverage issues relating to the claim for UM benefits -- are not arbitrable. (*Bouton v. USAA Casualty Ins. Co.* (2008) 43 Cal.4th 1190, 1200.)

As discussed further below, section 11580.2 contains provisions intended to prevent a "double recovery" of UM benefits and workers' compensation benefits for the same injury. (*Rangel, supra*, 4 Cal.4th at p. 9.) Among the principal benefits available through the workers' compensation system are temporary disability indemnity and permanent disability indemnity. (*Department of Rehabilitation v. Workers' Comp. Appeals Bd.* (2003) 30 Cal.4th 1281, 1291.) The former replaces a fixed

6

percentage of the wages lost by the worker during the healing period (*County of Alameda v. Workers' Comp. Appeals Bd.* (2013) 213 Cal.App.4th 278, 282-283; see Lab. Code, § 4653); the latter provides compensation for the residual loss of function after maximum recovery from the injury, based on a "rating" of that loss (*Genlyte Group, LLC v. Workers' Comp. Appeals Bd.* (2008) 158 Cal.App.4th 705, 715-716; see Lab. Code, § 4660).

Additionally, the injured worker is entitled to recover the costs of medical treatments "reasonably required to cure or relieve . . . the effects of his or her injury." (Lab. Code, § 4600, subd. (a).) That right is subject to certain limitations, as "[e]mployers and their insurers may establish or contract with a medical provider network to treat injured employees. [Citation.] An injured employee may visit medical providers outside such networks only if the employer has not established a network or if the employee notified the employer in writing prior to the date of injury that he or she has a personal physician. [Citation.]" (*Chorn v. Workers' Comp. Appeals Bd.* (2016) 245 Cal.App.4th 1370, 1377.) Generally, medical providers are permitted to assert liens on workers' compensation benefits for the costs of medical services that are unpaid or contested. (*Ibid.*)

Section 11580.2 includes two provisions designed to prevent a double recovery of UM benefits and workers' compensation benefits for the same injury. (*Rangel, supra,* 4 Cal.4th at pp. 7-9.) In 1961, the Legislature amended the statute to permit the reduction of UM benefits in the event of workers' compensation benefits. (Stats. 1961, ch. 1189, § 2, p. 2931; *Rangel, supra,* 4 Cal.4th at p. 7.) Subdivision (h) of section 11580.2 states: "Any loss payable under the terms of the uninsured motorist . . . coverage to or for any person may be reduced: [¶] . . . By the amount paid and the present value of all amounts

7

payable to him or her . . . under any workers' compensation law, exclusive of nonoccupational disability benefits." As explained in *Waggaman v. Northwestern Security Ins. Co.* (1971) 16 Cal.App.3d 571, 575 (*Waggaman*), this provision authorizes insurers to include in automobile policies clauses mandating the reduction of UM benefits to reflect workers' compensation benefits. However, the Legislature has enacted no statute permitting automobile insurers to impose liens on workers' compensation benefits in order to recover excessive UM benefit payments. (*Rangel, supra,* 4 Cal.4th at pp. 9-11, 15.)

Section 11580.2 also imposes a stay of arbitration regarding UM benefit disputes until specified circumstances occur relating to a workers' compensation claim. (*Rangel, supra,* 4 Cal.4th at p. 8.) Subdivision (f) of the statute provides: "If the insured has or may have rights to benefits, other than nonoccupational disability benefits, under any workers' compensation law, the arbitrator shall not proceed with the arbitration until the insured's physical condition is stationary and ratable. In those cases in which the insured claims a permanent disability, the claims shall, unless good cause be shown, be adjudicated by award or settled by compromise and release before the arbitration may proceed."[1] (§ 11580.2, subd. (f).) Our Supreme Court has explained that in 1973, the Legislature enacted the arbitration stay provision to

---

[1] Subdivision (f) of section 11580.2 further provides: "Any demand or petition for arbitration shall contain a declaration, under penalty of perjury, stating whether (i) the insured has a workers' compensation claim; (ii) the claim has proceeded to findings and award or settlement on all issues reasonably contemplated to be determined in that claim; and (iii) if not, what reasons amounting to good cause are grounds for the arbitration to proceed immediately."

8

prevent a type of arbitration-facilitated double recovery identified in *Waggaman*.[2]  (*Rangel*, *supra*, 4 Cal.4th at p. 9.)

The application of the two provisions described above was examined in *Rangel*.  There, the automobile policy's UM provisions reduced the loss payable under the policy by the workers' compensation benefits paid or payable to the insured -- in terms closely tracking subdivision (h)(1) of section 11580.2 -- but permitted arbitration of disputes regarding the loss payable -- thus authorizing an arbitration broader than required under subdivision (f) of section 11580.2.  (*Rangel*, *supra*, 4 Cal.4th at pp. 11, 17.)  After the insured suffered injuries in an accident involving an uninsured motorist, she filed a claim for UM benefits and sought workers' compensation benefits, including permanent

---

[2]  In *Waggaman*, the plaintiff sought UM policy benefits and workers' compensation benefits, including permanent disability indemnity.  (*Waggaman*, *supra*, 16 Cal.App.3d at pp. 573, 575-576.)  The UM provisions contained a term mandating that UM benefits be reduced by the workers' compensation benefits paid or payable, as permitted under section (h)(1) of section 11580.2.  (*Waggaman*, *supra*, at pp. 574-575.)  Prior to the permanent disability award, pursuant to the UM policy provisions, the plaintiff and his insurer submitted to arbitration the amount of UM benefits due under the policy.  (*Id*. at pp. 575-576.)  The arbitrator declined to reduce the UM benefits to reflect the plaintiff's prospective permanent disability award because it could not be valued.  (*Id*. at pp. 573-574.)  After the arbitrator's award was confirmed, the appellate court affirmed.  While recognizing that section (h)(1) of section 11580.2 was intended to bar a double recovery of UM benefits and workers' compensation benefits, the court found nothing in section 11580.2 or the workers' compensation statutes foreclosing a possible double recovery under the circumstances presented.  (*Waggaman*, *supra*, at pp. 579-580.)

9

disability indemnity.  (*Id*. at pp. 5-6.)  The automobile insurer initially refused to pay UM benefits until her workers' compensation claim was resolved.  (*Id*. at p. 5.)  Almost two years after the accident, the insured requested arbitration of her claim for UM benefits, but the arbitrator ordered the proceeding stayed while the workers' compensation proceeding was pending.  (*Ibid*.)  More than six years after the accident, while the workers' compensation proceeding was still pending, the automobile insurer paid the maximum amount of the UM coverage.  (*Id*. at p. 6.)  When the workers' compensation proceeding terminated, the insured sued the automobile insurer for bad faith.  (*Ibid*.)

After the trial court granted judgment on the pleadings in favor of the insurer, our Supreme Court affirmed, concluding that under the specific circumstances presented, the arbitration stay provision in section 11580.2, subdivision (f), operated to exonerate the insurer of bad faith.  (*Rangel*, *supra*, 4 Cal.4th at pp. 10-13.)  The court determined that because the insured claimed a permanent disability, the arbitration stay provision expressly required that arbitration be stayed absent a showing of good cause, which the insured never offered.  (*Id*. at pp. 8, fn. 6, 13-14.)  The court further determined that under the policy's terms, the reduction of UM benefits to reflect workers' compensation benefits was an arbitrable issue:  "The policy's arbitration clause is broader than that required [under section 11580.2, subdivision (f)].  The statute requires only that the damages due from the uninsured motorist be subject to arbitration.  In contrast, the policy's arbitration clause encompasses disputes concerning the amount owing under the insurance policy as well as the damages due from the uninsured motorist."  (*Id*. at p. 11.)  The court concluded:  "Because the policy . . . provides for arbitration in the event of a dispute over the loss payable, and because [the

10

insured's] workers' compensation claim was not resolved [for over eight years], there was an arbitrable issue which could be delayed under section 11580.2 unless good cause was shown." (*Id*. at p. 13.)

In so concluding, the court found that the UM policy term reducing the loss payable in the event of workers' compensation benefits was "clear and unambiguous," that is, free of any ambiguity relevant to the specific issues presented. (*Rangel*, *supra*, 4 Cal.4th at p. 14.) Relying on that determination, the court rejected the contention that the insurer was required to pay *some* UM benefits regardless of the outcome of the workers' compensation proceeding because the UM policy provisions mandated payment of some items of damages -- such as foreseeable economic loss -- not offset by workers' compensation benefits. (*Id*. at p. 17.) The court explained that because the insured had "bargained for a policy in which workers' compensation benefits would be deducted from the uninsured motorist policy limit, . . . the insurer is only liable for the excess, if any, of the policy limit over the workers' compensation benefits. If there is no excess, the uninsured motorist insurer has no duty to pay general damages that are not compensable by workers' compensation." (*Ibid*.)

C.     *Underlying Proceedings*

We next examine the parties' showings, with special attention to the evidence bearing on the issues raised on appeal.

1.     *State Farm's Evidence*

State Farm submitted evidence supporting the following version of the underlying events: The UM provisions of Case's policy stated: "Any amount payable . . . shall be reduced by any amount paid or payable to . . . the insured[] [¶] . . . [¶] . . . under any workers' compensation, disability benefits, or similar law."

11

(Italics omitted.)  Additionally, the policy stated that there was no coverage for bodily injury "to the extent [such coverage would] benefit[]  [¶] . . . any worker's compensation or disability benefits insurance company."  (Capitalization omitted.)  The policy further provided for arbitration of disputes limited to the issues set forth in subdivision (f) of section 11580.2.[3]

In a letter dated July 17, 2014, Case's counsel, John W. Phillips, submitted a demand for UM benefits totaling $66,712, including $14,212 in past medical expenses, $25,500 in future medical expenses, and $27,000 for noneconomic "pain and suffering" damages.  Noting that Case was 27 weeks pregnant when the accident occurred, Phillips stated:  "Fortunately, [Case] had a successful birth and has now concluded her physical therapy and other medical treatment."  According to Phillips, Case expected to incur future medical expenses because she had been diagnosed with "significant disc bulges" and required epidural injections to treat on-going pain.  The demand stated that a particular doctor -- who had already billed Case for services totaling $1,525 -- had recommended that she undergo three or more epidural injections at a cost of $8,500 per injection.  Phillips made no reference to benefits paid to Case through her workers' compensation claim.

---

[3]     The policy stated:  "Two questions must be decided by agreement between the insured and us:
    1.  Is the insured legally entitled to collect damages from the owner or driver of the uninsured motor vehicle; and
    2.  If so, in what amount?
If there is no agreement, upon written request of the insured or us, these questions shall be decided by arbitration as provided in section 11580.2."   (Italics omitted.)

12

On August 7, 2014, a State Farm claim specialist contacted Phillips and acknowledged receipt of the demand. According to the claim file, the specialist told Phillips that she needed "additional docs to proceed with [the] evaluation," as well as "WC information."

On September 22, 2014, Phillips submitted to State Farm medical records relating to the cause of Case's back injuries. Phillips also presented documentation from Case's workers' compensation insurer reflecting an existing lien for $1,873.72. The documentation did not refer to certain claimed items of past medical costs -- totaling $9,794 -- detailed in the July 2014 demand, including the services rendered by the doctor who recommended a course of epidural injections.

In a letter to Phillips dated October 30, 2014, State Farm stated: "[A]dditional information is required to . . . extend an offer. [¶] Please provide a copy of the workers' compensation final lien and breakdown for our review . . . ." On the same date, State Farm also asked Gallagher Bassett Services, Inc. (Gallagher Bassett), the third party administrator responsible for processing Case's workers' compensation claim, to provide the "status of [the] claim and notice of final lien." Case provided no information establishing that the past medical expenses itemized in the July 2014 demand but not reflected in the September 2014 documentation had been addressed through Case's workers' compensation claim. State Farm also received no information establishing that Case's future medical expenses had been addressed through Case's workers' compensation claim.

In November 2014, Case demanded arbitration. In a letter to Case dated December 4, 2014, a State Farm claims manager stated: "You allege State Farm has not made a fair offer of settlement of your [UM benefits] claim. . . . Your workers'

13

compensation carrier paid $2,164.99 on your behalf and closed your claim. The demand received from . . . Phillips on July 21, 2014, lists past special damages of $14,212 and estimated future medical costs of $25,000. [¶] It appears you withdrew your workers' compensation claim after your initial treatment in favor of presenting your claim exclusively to State Farm." After noting that the policy reduced UM benefits in the event of workers' compensation payments and quoting section 11580.2, subdivision (h)(1), the letter further stated: "[A] determination must be made to what extent workers' compensation benefits continue to be owed to you prior to State Farm's ability to determine what is owed from your . . . [p]olicy. [¶] Your attorney requested . . . arbitration. State Farm is in the process of preparing your case for referral to legal counsel to begin the discovery process."

In late February 2015, during prearbitration discovery, Case testified in a deposition that she was still experiencing pain from the injuries she incurred in the accident. Case's responses to State Farm's interrogatories also stated that she continued to suffer pain from those injuries.

On March 30, 2015, after Phillips requested a "final" lien balance relating to the workers compensation claim, a Gallagher Bassett manager responded: "Unfortunately, the only items I can provide you is . . . [a] benefit printout showing a total of $2,164.99 has been paid to date. Since [Case] was never discharged from care under the workers' compensation system she may return at a later date and seek additional medical treatment under this claim . . . ."

In a letter dated July 6, 2015, Phillips informed State Farm's counsel that Case's medical condition was stationary and that she had received no medical treatments since October 2013.

14

Phillips stated: "There is no better evidence of [Case]'s lack of need for further medical treatment than her lack of further medical treatment. By any reasonable measure, [Case]'s physical condition is 'stationary and ratable.' Therefore, the status of her workers['] compensation claim does not excuse State Farm's refusal to schedule an arbitration date in this matter." (Emphasis omitted.)

In an e-mail to Phillips dated September 18, 2015, a Gallagher Bassett manager stated: "I have reviewed your request for reimbursement of medical expenses[,] and since [Case] was not treated under the workers['] compensation system, all medical treatment obtained is considered self-procured and is not reimbursable. As you are aware, all bills or treatment obtained . . . is not payable under the workers' compensation system. Furthermore, there was no authorization, and treatment was not referred by the designated treating physician . . . ." The following day, Phillips forwarded the e-mail to State Farm.

On November 19, 2015, Case and State Farm agreed to settle her UM benefits claim for $35,000. Five days later, State Farm issued the settlement funds to Case.

### 2. *Case's Evidence*

In opposing the motion for summary adjudication or judgment, Case challenged little of State Farm's showing. Her principal contention was that there were triable issues because that showing was incomplete.[4]

---

[4] In an effort to establish triable issues, Case also asserted evidentiary objections to State Farm's showing in her separate statement of undisputed facts. Because the trial court did not expressly rule on the objections, it presumptively overruled them. (*Archer v. United Rentals, Inc.* (2011) 195 Cal.App.4th 807, 813,

15

According to Case's showing, Phillips responded promptly to State Farm's October 30, 2014 request for verification of a final workers' compensation lien by submitting by e-mail evidence that he described as "the workers' comp lien for my client." A State Farm claim specialist then asked, "[C]an you send me something in writing that confirms this is a final lien. [¶] . . . Just need something that confirms final lien." Later, in an e-mail to Phillips dated November 6, 2014, the claim specialist stated: "I revd call from . . . Gallagher and confirmed final lien. I am waiting for authority on it."

On November 12, 2014, Case demanded arbitration. Accompanying the demand was Phillips's declaration, which stated: "[Case's] workers['] compensation claim has settled on all issues reasonably contemplated to be determined in that claim. [Case] has no expectation that she will receive further benefits through that claim."

State Farm's claim file reflects the following note dated December 1, 2014: "There is a question as to whether [Case] can 'opt out' of [workers' compensation] benefits in order to pursue UM [benefits] solely through [State Farm]. . . . We have a 'final' [workers' compensation] lien amount; however, [Case] withdrew her [workers' compensation] claim after she retained counsel so the [workers' compensation] carrier paid only for initial treatment." On December 11, 2014, Phillips provided State Farm with another copy of the lien he had given to State Farm.

In a letter to Phillips dated March 11, 2015, after discussing Case's deposition, State Farm's counsel stated:

---

fn. 4.) As Case has not reasserted her objections on appeal, she has forfeited any claim of error regarding the implied rulings. (*Ibid.*)

"[Case's] worker[s'] compensation claim must be completely resolved before State Farm can complete its evaluation of her claim.  [¶] . . . [¶]  If her claim is still pending, we will have to wait for it to be concluded before State Farm can evaluate the claim.  If the claim has been completely resolved, State Farm should be provided with documentation that states what worker[s'] compensation benefits she received as a result of that claim, so that the evaluation can take place."

On March 13, 2015, Phillips responded that four months earlier, State Farm obtained satisfactory proof that the workers' compensation claim was completely resolved, pointing to the State Farm claim specialist's November 6, 2014 e-mail.  Phillips stated:  "The fact that [Case]'s workers['] comp claim has resolved is beyond dispute.  Any delay in resolving this [UM] claim on the basis of an 'open' workers['] comp claim is therefore completely without merit."

On April 9, 2015, Phillips provided State Farm with another copy of Case's workers' compensation lien itemization and asked:  "Please confirm that this satisfies your need to verify the 'final' status of [Case's] workers' compensation claim."  Phillips received no response.

From March through mid-July 2015, State Farm made no requests for documentation establishing the medical expenses she had incurred or the status of her workers' compensation claim.  On July 23, 2015, at State Farm's request, Case submitted her bills for previous medical services to "workers['] compensation" in order to determine whether they were payable through the workers' compensation system.

D.   *Analysis*

We conclude that the trial court did not err in granting summary judgment.  At the outset, we observe that our inquiry

17

has a narrow scope. Because Case neither discusses her claim for breach of the insurance contract nor suggests that there are unpaid policy benefits, she has forfeited any contention of error that summary adjudication was improperly granted with respect to that claim. (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1177; *Yu v. Signet Bank/Virginia* (1999) 69 Cal.App.4th 1377, 1398; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.) In connection with the bad faith claim, Case contends only that State Farm improperly declined to pay UM benefits -- including noneconomic damages -- prior to a determination regarding the extent to which her medical expenses were payable through the workers' compensation system; she raises no contention that State Farm improperly delayed arbitration under subdivision (f) of section 11580.2. Our inquiry thus focuses primarily on whether State Farm acted unreasonably in applying the key loss-payable-reduction policy provision authorized by subdivision (h)(1) of section 11580.2. As explained below, Case has established no triable issues regarding bad faith.[5]

---

[5] In seeking summary adjudication on the bad faith claim, State Farm relied primarily on *Rangel*, which placed special emphasis on the arbitration stay provisions in section 11580.2, subdivision (f). However, we may affirm the summary adjudication on a theory not relied upon by the trial court, provided that the parties have had an adequate opportunity to address that theory. (*Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1147; *Bains v. Moores* (2009) 172 Cal.App.4th 445, 471, fn. 39; Code Civ. Proc., 437c, subd. (m)(2).)

That requirement is satisfied here. Before the trial court and on appeal, State Farm asserted that the loss-payable-reduction policy provision and subdivision (h)(1) of section

18

1. *Loss-Payable-Reduction Policy Provision*

We begin by examining the policy to determine the extent to which it permitted State Farm to reduce UM benefits to reflect medical expenses included in her July 2014 demand for which she had not asserted a workers' compensation claim. We find guidance from *Bailey v. Interinsurance Exchange* (1975) 49 Cal.App.3d 399 (*Bailey*).

In *Bailey*, *supra*, 49 Cal.App.3d at pages 401-402, the plaintiff's automobile policy provided coverage for medical expenses, subject to an exclusion stating: "This policy does not apply to bodily injury . . . if benefits therefor are in whole or in part either payable or required to be provided under any Work[ers'] Compensation Law." After the plaintiff was injured in a car accident in the course of his employment, he did not apply for workers' compensation benefits. (*Id*. at p. 402.) When the insurer declined to pay policy benefits for medical expenses, the plaintiff asserted a claim for breach of insurance contract. (See *id*. at p. 404.) Relying on the policy exclusion, the trial court found that the claim failed. (*Id*. at p. 402.) Affirming, the appellate court concluded that although the term "'payable'" in the exclusion was potentially ambiguous in isolation, the exclusion's meaning was clear: "[T]he additional language 'or required to be provided under any work[ers'] compensation law' . . . is susceptible to only one reasonable and logical

---

11580.2 support summary adjudication on the bad faith claim, and Case presented her views regarding that theory in her reply brief. (*Bains v. Moores, supra*, 172 Cal.App.4th at p. 471, fn. 39.) We therefore conclude that the alternative theory is properly available to us as a ground for affirming summary judgment. (See *Byars v. SCME Mortgage Bankers, Inc., supra,* 109 Cal.App.4th at p. 1147; *Bains v. Moores, supra*, at p. 471, fn. 39.)

interpretation.  That interpretation is that the policy excludes coverage for an injury for which the insured is eligible for work[ers'] compensation benefits." (*Id.* at p. 404.)

We conclude that the loss-payable-reduction provision in Case's policy authorized State Farm to reduce UM benefits to reflect certain medical expenses potentially included in her July 2014 demand, namely, past and future expenses for injury-related treatments payable through -- but not submitted to -- the workers' compensation system.  That provision states that the UM benefit "shall be reduced by any amount paid or *payable* to . . . the insured [¶] . . . [¶] . . . *under any workers' compensation,* disability benefits, or similar *law*." (Italics omitted and added.) Here, the term "payable" necessarily encompasses medical expenses eligible for payment through the workers' compensation system, regardless of whether the insured has submitted a claim for them.  That conclusion flows from the italicized language, viewed in conjunction with the related policy provision expressly denying coverage for bodily injury "to the extent [such coverage would] benefit[] [¶] . . . any workers' compensation . . . insurance company." (Capitalization omitted.)  The italicized language and accompanying policy provision -- like the additional language in *Bailey* -- supports only one reasonable interpretation, namely, that the provision applied to medical expenses *eligible* for payment as workers' compensation benefits.  That interpretation comports with the legislative intent underlying subdivision (h)(1) of section 11580.2, which authorizes the provision. (*Rangel*, *supra*, 4 Cal.4th at p. 14; *Waggaman*, *supra*, 16 Cal.App.3d at p. 579.)

Our conclusion receives additional support from that statute, as it provides that the loss payable may be reduced by "the present value of all amounts payable" under the workers'

20

compensation law. (§ 11580.2, subd. (h)(1).) Although the loss-payable-reduction provision in Case's policy does not qualify the term "payable" by the phrase "the present value of all amounts," that statutory restriction is necessarily implied. (*Mid-Century Inc. Co. v. Gardner* (1992) 9 Cal.App.4th 1205, 1219-1220 [UM coverage provisions less favorable to insured than set forth in section 11580.2 are not enforceable].) The phrase "the present value of all amounts payable," by its plain meaning, encompasses all determinable workers' compensation benefits for which the insured is eligible, including benefits that will or can be paid in the future.[6]

---

[6]  We recognize that under exceptional circumstances not presented here, the application of the term "payable" in a loss-payable-reduction policy provision may be subject to uncertainty, in view of the statutory requirement that the "payable" amounts of workers' compensation benefits must be reduced to present value. In *Waggaman*, the pertinent provision expressly included that requirement. (*Waggaman, supra*, 16 Cal.App.3d at pp. 574-575.) After the plaintiff sought UM benefits and workers' compensation benefits, including permanent disability indemnity, the plaintiff and his automobile insured submitted the UM claim to an arbitrator, who declined to value the then-unresolved permanent disability award for purposes of reducing the UM benefits. (*Id*. at pp. 573-574.) The appellate court concluded that the arbitrator did not err, reasoning that under the circumstances, the meaning of the phrase "'the present value of all amounts payable'" was ambiguous, and thus properly construed unfavorably to the insurer. (*Id*. at pp. 576-578.) The court explained: "It is virtually impossible to arrive at an accurate amount which will be paid under permanent disability awards of work[ers'] compensation when the insured is not yet ratable for permanent disability." (*Id*. at p. 576.)

The provision in Case's policy thus required that the loss payable be reduced by the determinable medical expenses eligible for payment through the workers' compensation system, regardless of whether Case submitted a claim for them. For that reason, State Farm could not ascertain the loss payable until the amount of such expenses was known to State Farm. Accordingly, the provision authorized State Farm to request a determination regarding the extent to which her past and future medical expenses could be paid through that system.

2. *No Triable Issues Regarding Bad Faith*

The remaining question is whether State Farm acted reasonably in delaying payment of UM benefits, including benefits for noneconomic damages. In view of our conclusion regarding the meaning of the loss-payable-reduction provision, the resolution of that question hinges on whether State Farm acted reasonably in connection with its request for a determination of the extent to which Case's medical expenses were eligible for payment through the workers' compensation system. That is because State Farm's maximum liability for all UM benefits was determined by the amount of the eligible expenses. As explained in *Rangel*, under the loss-payable-

---

The potential ambiguity identified in *Waggaman* is not pertinent here. *Waggaman* establishes only that a loss-payable-reduction provision is ambiguous when the "payable" amounts of future workers' compensation benefits *must* be determined at a time when it is impossible to value them. As we discuss further (see pt. D.2., *post*), those circumstances are not presented here. Case claimed medical treatment expenses -- rather than a permanent disability -- and the evidence otherwise showed that her eligibility for workers' compensation benefits was determinable through inquiries to Gallagher Bassett.

reduction policy provision, the insurer is liable only for the "excess, if any, of the policy limit over the workers' compensation benefits," that is, the difference between the policy limits and the applicable workers' compensation benefits. (*Rangel*, *supra*, 4 Cal.4th at p. 17.) Accordingly, as the amount of the medical expenses eligible for payment through the workers' compensation system increased, State Farm's liability for UM benefits diminished.

In our view, no triable issues exist regarding whether State Farm acted reasonably in seeking an eligibility determination. Generally, the reasonableness of an insurer's conduct "must be evaluated in light of the totality of the circumstances surrounding its actions." (*Wilson*, *supra*, 42 Cal.4th at p. 723.) Thus, the adequacy of the insurer's claims handling is properly assessed in light of conduct by the insured delaying resolution of a claim. (*Blake v. Aetna Life Ins. Co.* (1979) 99 Cal.App.3d 901, 905-906.)

The record establishes that Case's July 2014 demand sought approximately $40,000 in medical expenses, but did not mention her workers' compensation claim. The demand included $25,000 for future epidural injections to treat Case's pain. In August 2014, State Farm informed attorney Phillips that it needed "WC information." The next month, Phillips submitted documentation showing the existence of a workers' compensation lien for $1,873.72.

In October 2014, State Farm asked Phillips to provide a workers' compensation "final" lien and breakdown, and also asked Gallagher Bassett to verify "the status of [the] claim and notice of final lien." After Phillips submitted to State Farm what he described as "the workers' comp lien," State Farm requested confirmation that it was a final lien.

23

In early November 2014, a State Farm claim specialist informed Phillips that Gallagher Bassett had "confirmed final lien" and that she was "waiting for authority on it."  Shortly afterward, Case submitted her demand for arbitration, supported by Phillips's declaration stating that Case expected no additional workers' compensation benefits.

In a letter dated December 4, 2014, in response to the demand for arbitration, State Farm observed that Case appeared to have withdrawn her workers' compensation claim after having received only $2,164.99 in benefits, even though she asserted the existence of approximately $40,000 in past and future medical expenses.  After pointing to the statutory and contractual provisions authorizing the reduction of UM benefits to reflect paid and payable workers' compensation benefits, State Farm stated:  "[A] determination must be made to what extent worker[s'] compensation benefits continue to be owed to you prior to State Farm's ability to determine what is owed from your . . . policy."

During prearbitration discovery in February 2015, Case testified that she continued to suffer pain from her injuries.  At that time, State Farm again informed Case that her workers' compensation claim "must be completely resolved before State Farm can complete its evaluation of her claim."  The following month, when Phillips requested a final lien balance, Gallagher Bassett responded that it could provide only a printout showing that $2,164.99 had been paid to date.  Gallagher Bassett explained:  "Since [Case] was never discharged from care under the workers' compensation system she may return at a later date and seek additional medical treatment under this claim . . . ."

In July 2015, Phillips informed State Farm that Case's medical condition was stationary, that she had received no

24

medical treatment since October 2013, and that she needed no further treatment. At State Farm's request, Case also submitted her bills for past medical services to Gallagher Bassett in order to determine whether they were payable through the workers' compensation system. In September 2015, Gallagher Bassett determined that Case's past medical expenses were not recoverable through that system. In November 2015, State Farm settled Case's claim.

On this record, there are no triable issues regarding the reasonableness of State Farm's resolution of Case's claim for UM benefits. When Case submitted her July 2014 demand, State Farm promptly requested information regarding her workers' compensation claim. Although a dispute arose in November 2014 when Case provided evidence of a purported final lien and denied the likelihood of receiving additional workers' compensation benefits, the dispute was "genuine," as State Farm had reason to believe that Case's medical expenses were eligible for payment through her workers' compensation claim, which she had withdrawn. (*Wilson*, *supra*, 42 Cal.4th at p. 723 [dispute is genuine when insurer advances position "in good faith and on reasonable grounds"].) In early December 2014, State Farm requested a determination regarding the extent to which she was "owed" workers' compensation benefits for her past and future medical expenses. However, Phillips first asked Bassett Gallagher whether Case's past medical expenses were payable through the workers' compensation system in July 2015, when he also disclosed to State Farm that Case had completed her medical treatment. The facts crucial to establishing the loss payable -- namely, the extent to which Case was entitled to worker's compensation benefits -- were fully known by State Farm only in September 2015, when Bassett Gallagher made the requested

determination. Because State Farm resolved Case's claim shortly after that determination, no triable issues exist regarding bad faith.

3. *Case's Contentions*

Case's principal contentions rely on regulations requiring insurers to provide explanations of delays in accepting claims, and pay accepted claims promptly. (Cal. Code Regs., tit. 10, § 2695.7, subds. (e), (h).) Case maintains that under those regulations, State Farm was not permitted to delay payment of UM benefits pending a determination of her medical expenses eligible for payment through the workers' compensation system. We disagree. The regulations in question state: "No insurer shall delay or deny settlement of a first party claim on the basis that responsibility for payment should be assumed by others, *except as may otherwise be provided by policy provisions, statutes* or regulations, including those pertaining to coordination of benefits." (Cal. Code Regs., tit. 10, § 2695.7, subd.(e), italics added.) In view of the italicized language, State Farm did not contravene the regulations, as the loss-payable-reduction policy provision and Insurance Code section 11580.2, subdivision (h)(1) expressly authorized the reduction of UM benefits to reflect "payable" workers' compensation benefits.

Case further contends that as early as November 2014, when she submitted her request for arbitration, State Farm was obliged to settle her claim, or at minimum, pay the noneconomic damages she demanded. (Cal. Code Regs., tit. 10, § 2695.7, subd. (h.)[7] She argues that because the declaration from Phillips

---

[7] California Code of Regulations, title 10, section 2695.7 provides in pertinent part: "(h) Upon acceptance of the claim in whole or in part . . . , every insurer . . . shall immediately, but in

26

accompanying her request informed State Farm that she had concluded her medical treatments, State Farm then knew that the maximum potential reduction of the UM benefits was determined solely by Case's "previously incurred medical bills." Case thus maintains that State Farm was in a position to calculate the maximum potential reduction and pay all undisputed claimed benefits within the adjusted coverage limit.

Case's contention fails, as Phillips's declaration is not plausibly viewed as stating that Case had concluded her medical treatment. Case's request for arbitration expressly referred to her July 2014 demand for UM benefits, which included a claim for $25,500 in future medical expenses. Phillips's declaration stated: "[Case's] workers['] compensation claim has settled on all issues reasonably contemplated to be determined in that claim. [Case] has no expectation that she will receive further benefits through that claim." As reflected in State Farm's December 4, 2014 response to the arbitration request, State Farm reasonably understood Phillips to be affirming nothing more than that Case had withdrawn her workers' compensation claim. The record otherwise discloses that not until July 2015 did Phillips expressly inform State Farm that Case had concluded her medical treatment.[8]

no event more than thirty (30) calendar days later, tender payment or otherwise take action to perform its claim obligation."

[8]      The decisions upon which Case relies are distinguishable, as they involved insurers who engaged in bad faith by declining to pay policy benefits for wholly meritless reasons. (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 921 [insurer engaged in bad faith by failing to pay portion of UM benefits not subject to any dispute]; *Beck v. State Farm Mut. Auto. Ins. Co.*

27

In a related contention, Case maintains that State Farm failed to explain why it was delaying payment of her UM benefits and how she could secure the benefits. However, State Farm's December 4, 2014 response stated (1) that Case was claiming past and future medical expenses not paid through her workers' compensation claim, (2) that she appeared to have withdrawn that claim in order to submit those expenses solely to State Farm for payment, (3) that the policy and section 11580.2 authorized the reduction of UM benefits to reflect "payable" workers' compensation benefits, and (4) that there must be a determination of the workers' compensation benefits "owed" to Case. The response thus provided an adequate explanation for

---

(1976) 54 Cal.App.3d 347, 355 [insurer engaged in bad faith by withholding UM benefits on basis of "patently untenable" defense].) In contrast, the record here discloses a reasonable basis for State Farm's delay in paying the UM benefits. Case's July 2014 demand for approximately $40,000 in past and future medical expenses, coupled with her deposition testimony in early 2015 that she continued to suffer pain from her injuries, precluded an estimate of the reduction in the loss payable under the UM provision of the policy.

Case's reply brief offers an alternative basis for her contention that Phillip's declaration triggered State Farm's obligation to pay UM benefits. She argues (1) that under subdivision (f) of section 11580.2, State Farm was required to pay UM benefits as soon as Case's condition was "stationary and ratable," and (2) that Phillips's declaration established that Case's condition was then "stationary and ratable." We reject the argument, as the statute identifies the existence of a stationary and ratable condition as the threshold requirement for arbitration -- not the obligation to pay UM benefits -- and Phillips's declaration is not reasonably viewed as referring to that requirement.

28

State Farm's conduct. Furthermore, although the response did not expressly ask Case to submit a workers' compensation claim for her medical expenses, the response's reference to her withdrawn workers' compensation claim unmistakably suggested that course of action.

Case also contends that Gallagher Bassett's September 2015 determination that Case's past medical expenses were not eligible for payment through the workers' compensation system conclusively established that State Farm engaged in bad faith. According to Gallagher Bassett, because Case had not been treated within that system, her treatment was "considered self-procured and [was] not reimbursable." Case argues: "Since the bills [Case] incurred outside the WC system were never payable to begin with, [State Farm's] insistence that [Case] submit these bills to her [workers' compensation] carrier for payment consideration before it would pay UM benefits is a position that has no legal basis whatsoever. [State Farm] asserted this position unreasonably, and consequently engaged in bad faith."

Gallagher Bassett's determination does not establish State Farm's bad faith. As explained above (see pt. D.2., *ante*), the existence of bad faith hinges on when State Farm *knew* the determination of Case's eligibility for workers' compensation benefits, not on the determination itself. The record discloses only that State Farm resolved Case's promptly after learning of her ineligibility for future Workers' Compensation benefits. In sum, Case has demonstrated no triable issues precluding summary judgment on her complaint.[9]

---

[9] In view of our conclusion regarding summary adjudication on the bad faith claim, summary adjudication was also proper

29

## DISPOSITION

The judgment is affirmed.  State Farm is awarded its costs on appeal.

MANELLA, P. J.

We concur:

WILLHITE, J.

COLLINS, J.

---

with respect to Case's request for punitive damages.  (See *Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 61.)

Filed 12/18/18

<u>CERTIFICATION FOR PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MELISSA CASE,<br><br>   Plaintiff and Appellant,<br><br> v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE CO., INC.,<br><br>   Defendant and Respondent. | B281732<br><br>(Los Angeles County<br>Super. Ct. No. BC583311)<br><br><br>ORDER CERTIFYING OPINION<br>FOR PUBLICATION |

THE COURT:*

  The opinion in the above-entitled matter, filed on November 21, 2018, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be certified for publication in its entirety in the Official Reports and it is so ordered.

_____

*MANELLA, P. J.    WILLHITE, J.    COLLINS, J.